WALTER E. BUCK AND EMILY L. BUCK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2487–65. Filed November 14, 1966.

---

*Norman A. Eisner*, for the petitioners.

*James E. Merritt* and *Joseph Nadel*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1961 | $4, 596. 41 |
| 1962 | 2, 889. 78 |
| 1963 | 6, 837. 96 |

The deficiency for 1961 is not contested. The parties have stipulated settlement of all issues relating to 1962 and 1963 except one. The sole issue remaining is whether respondent properly disallowed deductions claimed for 1962 and 1963 for medical expenses in the respective amounts of $2,428.50 and $5,521.17.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations of fact, together with exhibits attached thereto, are incorporated herein by this reference.

The petitioners, Walter E. Buck and Emily L. Buck, husband and wife, filed joint Federal income tax returns for the calendar years 1962 and 1963 with the district director of internal revenue at San Francisco, Calif. As the issues involved relate to Walter E. Buck, he will be referred to as the petitioner.

Prior to and throughout 1962 and 1963 petitioner was a director and an executive vice president in charge of the Western States of American Distilling Co., Inc., with offices at 1816 Russ Building in San Francisco, Calif. Petitioner also maintained a business office in his individual capacity at the same address. American had a distillery at Sausalito, Calif., which he sometimes visited. He also occasionally flew to New York City to attend meetings of the board of directors of American. He received a salary in the amount of $40,000 from American in each of the years 1962 and 1963, in addition to directors fees in the amount of $100 for 1962 and $600 for 1963.

Prior to and throughout 1962 and 1963 petitioner was also a director and member of the executive committee of the Pacific National Life Insurance (Assurance) Co., 215 Market Street, San Francisco, Calif., from which he reported the receipt of "director's fees" in the amount of $1,200 in 1962 and $900 in 1963. As a member of the executive committee petitioner received a fee of $100 for each meeting attended. This fee was not payable if he did not attend the meeting. It is stipulated petitioner attended meetings of the directors and executive committee in 1962 and 1963, as follows:

| Directors meetings | Executive committee meetings |
|---|---|
| March 16, 1962 | April 16, 1962 |
| April 25, 1962 | June 18, 1962 |
| August 20, 1962 | July 16, 1962 |
| November 19, 1962 | September 24, 1962 |
| May 27, 1963 | October 17, 1962 |
| August 21, 1963 | December 17, 1962 |
| September 18, 1963 | January 21, 1963 |
| | April 24, 1963 |
| | July 15, 1963 |

The inconsistency between the return and stipulation is not explained.

Prior to and during 1962 and 1963, petitioner was a director of Western Bank Corp. (Bancorporation), from which he reported the receipt of "directors' fees" in the amount of $2,525 for each of said years. The location of the offices of Western Bancorporation is not shown.

Prior to and during 1962, petitioner was also a director of the First Western Bank & Trust Co., from which he reported the receipt of "directors' fees" in the amount of $303. The location of its offices is not shown.

Prior to and during 1962, petitioner was also a director of Matson Navigation Co. and of Oceanic Steamship Co., both located at 215 Market Street, San Francisco, Calif. He reported the receipt of "salaries" in the amount of $600 from Matson and $150 from Oceanic for 1962, but no directors' fees from either. Petitioner retired as a director of Matson on May 11, 1962.

Prior to, during and after 1962 and 1963, the petitioners maintained an 11-acre estate in Woodside, Calif., and a town house at 3800 Washington Street in San Francisco. It was their custom to reside at their San Francisco home during the winter and at their Woodside estate during the summer.

Petitioners paid the following salaries to household employees in the periods shown:

| | July–Dec. 1962 | Year 1963 |
|---|---|---|
| George Ray Marcotte (chauffeur) | $2,100 | $4,200 |
| Yew Jew | 2,100 | 150 |
| Sam R. Navarra | 1,266 | 2,532 |
| Eleanor Engel Baltazar | 1,200 | 2,400 |
| John Yberra | 792 | 1,584 |
| Albert Chavez | 396 | 792 |
| Samboon Tantraphol | 700 | ------ |
| James K. Potter (chauffeur) | 450 | 900 |
| Edward Ebella | ------ | 3,500 |
| Randall Van Houten Stone (chauffeur) | ------ | 1,750 |

Petitioner was born on November 28, 1884. On October 9, 1961, he suffered a severe, grand mal epileptic attack. He was treated by Dr. John P. Strickler, an internist practicing in San Francisco. He

was under treatment for the rest of October and was able to return to his office on October 30 for a few hours. He was advised to avoid fatigue and not to drive an automobile.

On June 1, 1962, petitioner suffered another epileptic seizure. He was seen by Dr. Strickler and was taken by ambulance to a hospital. The diagnosis was epilepsy petit mal, cerebral arteriosclerosis, delirium, and confusion. He was treated by Dr. Strickler at the hospital and went home on or about June 8. The doctor consulted with two other physicians who saw the petitioner at the hospital. Dr. Strickler treated him at home for several weeks thereafter. He was able to go for automobile rides beginning June 10, went to his office for a half hour on June 12, and to his office for a half day on June 25. The doctor advised him not to drive his car and to remain active in a restricted degree in his business. Petitioner had no hobbies, avocation, or interests outside his business interests and his doctor considered remaining "active in his usual business interests very important in order to prevent tension and excitement from frustration and boredom which would be bad with his convulsive seizure type of illness."

Petitioner employed George Ray Marcotte as his chauffeur for the period from July 1, 1962 through 1963. Marcotte had previously been employed by petitioner for 15 years. Petitioner's wife had another chauffeur for her exclusive service. Marcotte drove petitioner's car for his trips to his office, the airport, and to the Sausalito distillery.

Petitioner's income tax returns reported a salary from American Distilling Co. of $40,000 in each of the years 1962 and 1963 and other salaries and fees as director or trustee, the totals aggregating $52,891.25 in 1962 and $47,032.50 in 1963. The total income reported was $251,581.49 in 1962 and $204,969.85 in 1963.

Petitioners, in their return for 1962, claimed a deduction of $5,160.62 for medical expenses, reporting total expenses of $7,552.62 and insurance received of $2,392. Included in the expenses was an amount of $2,428.50 for "Extra transportation costs due to medical condition." On their return for 1963 they claimed a maximum deduction of $10,000, reporting total expenses of $10,575.23, insurance reimbursement of $518.40, and net expense of $10,056.83. Included in the expenses were the following items:

```
Transportation costs due to medical condition:
    Chauffeur's salary and expense_____  $4,958
    Auto mileage for medical purposes—12,400 miles at
      5¢ mile_____     620
```

Respondent determined that $2,428.50 of the medical expenses claimed by petitioners for 1962, representing salary and meals for a chauffeur and two additional servants, did not qualify as deductible medical expenses for income tax purposes. He further determined

that $5,578 of the medical expenses claimed by petitioners for 1963, representing chauffeur's salary and expenses and auto mileage, did not qualify as deductible medical expenses for income tax purposes, and accordingly decreased petitioners' claimed medical deduction for 1963 by $5,521.27.

Petitioner offered no evidence relating to the meals and expenses of the chauffeur, the two additional servants, or the auto mileage, and is accordingly deemed to have abandoned any claim for the medical expenses disallowed except the salary paid petitioner's chauffeur Marcotte—$2,100 in 1962 and $4,200 in 1963.

The salary of petitioner Walter E. Buck's chauffeur, Marcotte, was not paid for transportation primarily for and essential to medical care, within the meaning of section 213, I.R.C. 1954.

OPINION

The basic question left for our determination is whether the salary paid to petitioner's chauffeur, Marcotte, in the taxable years 1962 and 1963 is deductible as medical expenses under the provisions of section 213 of the Internal Revenue Code of 1954, or whether such salary represents nondeductible personal expenses under the provisions of section 262 of the 1954 Code.

Section 213 (a) of the Internal Revenue Code of 1954 [1] allows as a deduction expenses paid for medical care during the taxable year and not compensated for by insurance or otherwise. Subsection (e) defines "medical care" as amounts paid for "the diagnosis, cure, mitigation, treatment, or prevention of disease" or for "transportation primarily for and essential to" such medical care.

Section 262 of the Internal Revenue Code of 1954 [2] provides that no deduction shall be allowed for personal, living, or family expenses "Except as otherwise expressly provided in this chapter."

---

[1] SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES.

(a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction the following amounts of the expenses paid during the taxable year, not compensated for by insurance or otherwise, for medical care of the taxpayer, his spouse, or a dependent (as defined in section 152) :

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(2) If either the taxpayer or his spouse has attained the age of 65 before the close of the taxable year—

(A) the amount of such expenses for the care of the taxpayer and his spouse,

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(e) DEFINITIONS.—For purposes of this section—

(1) The term "medical care" means amounts paid—

(A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body (including amounts paid for accident or health insurance), or

(B) for transportation primarily for and essential to medical care referred to in subparagraph (A).

[2] SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES.

Except as otherwise provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.

Petitioner contends that carrying on his business activities was part of the therapy advised and prescribed by his physicians; that the physicians believed the employment would give him a mental stimulus which would tend to prevent deterioration of his physical condition and would contribute to his recovery, that the employment of a chauffeur was necessary to permit him to carry on his business, since he should not drive his own car; and therefore, that the chauffeur's salary was deductible as a medical expense. He argues that the physicians considered his return to active business as an occupational therapy to avoid nervous strain, tension, and frustration, since he had no avocation or hobby to pursue. In substance, it is petitioner's contention that continuing in his business activities was a form of cure, mitigation, treatment, or prevention of disease and that his employment of a chauffeur to drive him to his place of employment was "primarily for and essential to" such medical care.

On the other hand, respondent contends that the salary of petitioner's chauffeur was a nondeductible personal expense within the meaning of section 262 in that it was an expense of commuting, or travel between home and office, which is ordinarily treated as a personal expense. We agree with respondent.

The attending physician testified that petitioner asked if he could drive his car and was told that he must not drive again because it would jeopardize both his own life and that of other persons. He also testified that petitioner asked if he could return to work and was told to remain active in his usual business activities. The doctor explained that this was important "to prevent tension and excitement from frustration and boredom, which would be bad with his convulsive seizure type of illness"; that petitioner had no hobby or avocation to pursue and his only interest was in his business; that remaining active in his work would be of material help as part of his treatment; that he should not be disturbed or upset or aggravated; and that keeping him idle would make the picture worse. The doctor further testified that taking the mebaroin and other medication prescribed was the most important and that petitioner didn't necessarily have to work if he could do something else which would occupy his mind and time.

We have some doubt whether the doctor's advice that he continue his business activities, given in response to petitioner's inquiry whether he could return to work, was anything more than permission to work rather than specific prescription that he continue his business pursuits. It is noted that the statements about work were not originally contained in the doctor's medical notes but were inserted some 2 or 3 years later after, as the doctor testified, some "question" arose. It is unnecessary to determine, however, whether the doctor in fact prescribed work as an occupational therapy. It is very clear that the doctor did not tell petitioner that he should employ a chauffeur to

drive him to and from his office. The doctor evidently thought the use of a chauffeur to get to and from his office was necessary because petitioner was told not to drive a car. There is no testimony he was told he could not ride in taxicabs or use other means of public transportation.

The record does not show whether petitioner had been accustomed to driving his own car to work prior to October 1961, when he had his first seizure and was told he could not drive a car, or what means of transportation he used prior to June 1, 1962. Petitioner testified he owned six automobiles, two of them Rolls-Royces, and that he had previously employed Marcotte for 15 years—whether for his own or family use is not shown. Apparently Marcotte was not working for him at the time of petitioner's seizure on June 1, 1962, because of illness. Prior to the seizure of June 1, 1962, petitioner had employed one or more chauffeurs for family use, including a chauffeur for his wife's car. He again hired Marcotte on or about July 1, 1962.

In our opinion the employment of Marcotte to drive petitioner to and from his places of business was a matter of petitioner's own personal choice, comfort, and convenience and was not "primarily for or essential to" medical care. The salary paid Marcotte was in the nature of commuting expenses and is not deductible. Sec. 262, I.R.C. 1954; Income Tax Regs., sec. 1.262–1; *Commissioner* v. *Flowers*, 326 U.S. 465; *James Donnelly*, 28 T.C. 1278, 1280, affd. 262 F. 2d 411, 413 (C.A. 2) ; *John C. Bruton*, 9 T.C. 882.

*Misfeldt* v. *Kelm*, an unreported case (D.Minn. 1952, 44 A.F.T.R. 1033, 52–2 U.S.T.C. par. 9495), and *Sanford H. Weinzimer*, T.C. Memo. 1958–137, cited by petitioners in support of their contentions, are distinguishable.

In the *Misfeldt* case the taxpayer was almost totally disabled and was unable to use ordinary and regular means of transportation. She was advised by her physician *to seek* remunerative employment as and for occupational therapy. She obtained such employment and was forced to employ a taxicab driver who would help her from her home into the taxicab and from it into her place of employment, and also another driver for the return trip to her home. The District Court held that the taxicab fares in 1946, 1947, and 1948 were deductible as medical expenses. In the present case there is no showing the petitioner was disabled to the extent of requiring personal assistance or that he could not have used other means of public transportation. The employment of a chauffeur to drive him to and from his places of business was clearly a matter of his own personal choice and for his comfort and convenience.

In the *Weinzimer* case the taxpayer was a war veteran who had suffered a spinal-cord injury and could not walk unaided. He ob-

tained employment at a veterans' hospital on the advice of his physician, who was also employed at the hospital. The doctor recommended employment as part of the therapy for the taxpayer's physical condition and also that he use a car in addition to other exercises for health reasons. The car used was equipped with handicap controls. The Court found:

> The use of the car both as a means of enabling petitioner to pursue the course of occupational therapy prescribed by his physician and for the physical activity which was occasioned by such use alleviated and mitigated ailments of petitioner directly caused by his principal illness consisting of the spinal cord injury. To the extent of 15/21 the car was used primarily for the purposes so described. That proportion of the car expenses shown was deductible as medical expense.

In that case both the driving of the car and the employment were recommended by the doctor for therapeutical purposes. In the present case, being driven to work by an employed chauffeur was not a part of the doctor's prescribed treatment and use of the car and chauffeur was a matter of personal choice.

In their reply brief, petitioners have also cited the case of *A. L. Miller*, 29 B.T.A. 1061, wherein the Estate of Henry C. Hawk, deceased, petitioner in one of the consolidated cases, was allowed the deduction of one-half of certain automobile expenses, including the employment of a chauffeur, as business expenses. The pleadings in the present case did not present an issue as to the deductibility of the chauffeur's salary as business expense. Nor do the facts presented furnish a basis on which an allocation could be made between the portion which might be considered deductible as business expense and the portion which is nondeductible as personal, including transportation between home and office. In fact there is no evidence as to how often petitioner went to his office in the Russ Building, whether he required use of an automobile to attend directors meetings at 215 Market Street or how many, if any, trips he made to Sausalito or the airport during the period in question. It is also noted that petitioner claimed an exclusion for sick pay in 1963, which indicates he did not go to his office during a substantial part of November and December 1963.

We determine the sole issue presented for the respondent.

*Decision will be entered under Rule 50.*