Joy L. Zubrod, Sr. v. Commissioner.
Zubrod v. Commissioner
Docket No. 640-66.
United States Tax Court
T.C. Memo 1967-204; 1967 Tax Ct. Memo LEXIS 57; 26 T.C.M. (CCH) 1010; T.C.M. (RIA) 67204; October 19, 1967
Joy L. Zubrod, Sr., pro se, 165 Brighton Blvd., Zanesville, Ohio. Clarence E. Barnes, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency in petitioner's income tax for 1963 in the amount of $299.58. Because of concessions by petitioner, only two issues remain for our consideration: (1) Is petitioner an "employee," or is he an independent contractor subject to the self-employment income tax? (2) May *58 petitioner deduct certain travel expenses incurred as a result of his wife accompanying him on a business trip as a driver for his car? General Findings of Fact Joy L. Zubrod resided in Zanesville, Ohio, at the time of filing his petition herein. Petitioner and his wife, Thelma K. Zubrod, filed their joint Federal income tax return for 1963 and an amended return for 1963 with the district director of internal revenue, Cincinnati, Ohio. [1]
Issue No. 1 - Findings of Fact Petitioner was hired by Savings and Loan Publications (hereinafter referred to as "Publications") in August 1962 to sell advertising space in certain magazines. Publications publishes and distributes a monthly magazine containing articles of interest for homeowners and other consumers. Many of the articles contain ideas for home improvements and for building and buying of homes. The magazine is published under various titles such as "Ideas for Better Living." Distribution is handled under one-year contracts with various banks and savings and loan associations. The sponsoring bank or savings *59 and loan association is given free advertising space in the magazine, paying only for mailing or other distribution costs. The sponsor will normally mail copies of the magazine to its customers. Additional circulation is provided by placing copies in the bank or savings and loan lobby and in waiting rooms, such as in doctors' offices. The agreement between Publications and the sponsoring institution gives the latter exclusive distribution rights in its locality for the magazine. Publications' publishing costs and profits are derived from the sale of space to local advertisers. Petitioner's job, as one of seven space salesmen in 1963, was to secure this local advertising. His duties did not include securing the initial contract with the sponsor, although he did obtain the sponsor's signature on renewal contracts. Once the initial contract with the sponsor was secured, one of the space salesmen would then be assigned to secure the advertising. A space salesman was assigned specific sponsoring institutions as his accounts rather than a geographical territory. Normally, once a particular account was assigned to a space salesman, that account was his for succeeding years. However, Publications *60 reserved the right to take an account away from a space salesman. When petitioner was first hired by Publications, he was instructed by one of the officers of Publications as to his duties and was furnished a detailed book of procedure, further describing his duties and offering certain suggestions on how to approach prospective advertisers. Publications made clear to its space salesmen that it was important for it to know where they were located at all times. Petitioner was to notify Publications promptly of where he was staying in each town and of any change of address. He was also supposed to send a current copy of the local telephone directory to Publications' office in Columbus by parcel post. Petitioner was specifically instructed that he was to contact the sponsoring institution before attempting to sell any advertisements. This call was intended to enable him to obtain suggestions from the sponsor as to prospective advertisers. Petitioner carried a letter from Publications to the sponsor requesting aid in obtaining advertisers. The letter stated in part: Our representative will be completely at your disposal while he is in your community. He will do all of the necessary *61 contact work. All he needs from you, in order to be completely successful, is a small amount of assistance in the form of friendly guidance. Our representative will be instructed to call on no one without first securing your full approval for each firm or individual whom you consider as friendly to your organization and eligible to receive an invitation to be represented as an advertiser in your magazine. After petitioner contacted the sponsor, he proceeded to contact prospective advertisers. Although, due to the nature of his work, petitioner had no set hours, he did have press deadlines to meet, and thus was not entirely free to proceed at his leisure. Petitioner was instructed to use the forms provided by Publications for the contracts with the advertisers. Petitioner was not authorized to change any of the terms of those contracts. Publications placed certain restrictions on whom petitioner could accept as an advertiser. If an advertiser from a prior year had been delinquent in paying his bills to Publications, petitioner was not permitted to renew the contract unless the balance due from the prior year was paid immediately. Because beauty shops had proved to be particularly *62 bad credit risks, petitioner was not authorized to accept advertisements from them, except to renew contracts with certain acceptable beauty shops. Petitioner was also instructed to obtain the approval of the sponsoring institution prior to calling on any prospective advertiser. Petitioner was further instructed not to promise an advertiser an "exclusive," e.g., he could not promise one lumberyard that none of its competitors would be accepted as advertisers. After all the advertising space had been sold and before leaving town, petitioner was required to pay a final call on the sponsor, to go over the list of advertisers. In addition to securing advertisers, a space salesman was directed to try to collect delinquent accounts. Space salesmen were required to report to the home office of Publications on a regular basis, either in person or by phone. Space salesmen were authorized to make all telephone calls to the home office on a collect basis. Publications did not furnish its space salesmen with a personal office. Petitioner was not hired for a specific length of time. He could leave his job at any time and could be dismissed by Publications at any time. When petitioner was *63 first hired by Publications, no formal contract was entered into. However, it was understood that petitioner's compensation would be in the form of commissions at specified rates. Petitioner was given a $150-per-week drawing account for traveling expenses as an advance against commissions. The commission was due upon return of the advertising contracts to Publications. The commissions were not reduced to reflect unpaid accounts. On June 1, 1963, petitioner and Publications signed the following agreement in connection with the drawing account: April 6, 1963 DRAWING ACCOUNT AGREEMENT I understand and agree that my sales connection with Savings and Loan Publications and/or Financial Publications is in the capacity of an Independent Contractor relationship - and that I will receive no salary or wages. I further understand that my income will be in the form of commissions in full payment for advertising contracts processed by me and that no federal, city or state tax, in any form, or social security tax, will be withheld from my commissions. I further understand that if any money is advanced to me by way of a DRAWING ACCOUNT, to be used for travelling and incidental expense purposes, *64 my earned commissions will first be used to offset the amount advanced and that I will, upon termination of my association with Savings and Loan Publications and/or Financial Publications, and/or their heirs and assigns, immediately repay the balance due (the excess, if any, of withdrawals less commissions earned) on said DRAWING ACCOUNT to Savings and Loan Publications. /s/ Joy LeRoy Zubrod, Sr. / Independent Contractor 165 Brighton Blvd. / Address ZanesvilleOhio / City State On behalf of Savings and Loan Publications, and in consideration of the promises hereinabove made by said Independent Contractor, I agree upon the termination of the association of said Independent Contractor with Savings and Loan Publications, and/or Financial Publications, etc., that I will immediately pay any plusbalance due (the excess, if any, of commissions earned, less withdrawals) on said DRAWING ACCOUNT to said Independent Contractor, his heirs and assigns. SAVINGS AND LOAN PUBLICATIONS By: /s/ Donald A. King / Managing Partner Petitioner paid all his traveling expenses and had no income from Publications except his commissions (including the drawing account). At no time did Publications *65 withhold any state or Federal taxes, or insurance, or retirement from petitioner's income. Petitioner's original Federal income tax return for 1963 showed $54.98 due as selfemployment tax. An amended return, dated August 3, 1964, showed a self-employment tax income of less than $400, so that no self-employment tax was due Respondent redetermined petitioner's self-employment income on the ground that petitioner was an independent contractor. Petitioner now contends that he was an employee of Publications and that therefore no self-employment tax is due for 1963 with respect to commissions paid him by Publications. Issue No. 1 - Ultimate Finding of Fact Petitioner was an employee of Publications. Issue No. 1 - Opinion The first issue herein is whether petitioner is subject to the tax on self-employment income. Under section 1402(c)[2] and (d), he is not subject to that tax on earnings received as an "employee" as defined under the Federal Insurance Contributions Act. That Act is set forth in Subtitle C, Chapter 21, of the Internal Revenue Code. Section 3121(d)[3] relates the definition *66 of "employee" to the rules of common law and to certain other types of employment which might not be covered by such definition. *67 There has been no suggestion herein that petitioner falls within one of the specific types of employees set forth in section 3121(d). Rather, the question is simply whether petitioner had the status of an employee of Publications "under the usual common law rules applicable in determining the employer-employee relationship." Though there are certain guidelines to deciding whether an individual is an employee of an independent contractor, each case must be decided on its own facts. Labels used by the parties are not of critical significance. United States v. Silk, 331 U.S. 704, 716 (1947). The elements to be considered are the "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required." United States v. Silk, supra at p. 716; see also Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 3 (1962). That the degree of control is the most important element is clearly revealed by the action of Congress in rejecting the "economic reality" test alleged to have been established by United States v. Silk, supra. *68 H. J. Res. 296, ch. 468, 62 Stat. 438; see United States v. Thorson, 282 F. 2d 157 (C.A. 1, 1960); Ringling Bros.-Barnum & Bailey Combined Shows v. Higgins, 189 F. 2d 865 (C.A. 2, 1951); Bonney Motor Express, Incorporated v. United States, 206 F. Supp. 22 (E.D. Va. 1962); S. Rept. No. 1255, to accompany H. J. Res. 296, supra, 80th Cong., 2d Sess., 1948-2 U.S. Code Cong. Serv. 1752-1775. We have set forth the details of petitioner's relationship with Publications in our findings of fact and will not repeat them here. We are satisfied that Publications retained and exercised sufficient control over petitioner (either directly or through the sponsoring institution as its instrument for that purpose) to make him an "employee" within the common law meaning of that term. Two officers of Publications testified for respondent. Although some of their testimony tended to support respondent's position, even they admitted that petitioner was not entirely free to do as he pleased and that Publications controlled the scope of petitioner's activities in various ways. Moreover, the manual of procedure describing the duties and responsibility of a space *69 salesman contained detailed limitations on his right to decide how to carry out his job. Publications informed the sponsoring institution that its representative, i.e., petitioner, would follow whatever instructions the sponsor prescribed. The sponsor, not petitioner, had the final say over whom could be invited to advertise in the magazine, subject only to Publications' right to veto poor credit risks. We note also that petitioner was entitled to his commissions whether or not the advertisers paid Publications for the space. That a space salesman could in a general way determine his hours of work, that he paid his own expenses, that he was paid on a commission basis, and that his employment was at will are not in and of themselves determinative. Cf. United States v. Silk, supra. On the basis of the entire record, we conclude that petitioner was an employee of Publications and therefore was not subject to the self-employment tax. Issue No. 2 - Findings of Fact To the extent relevant, the findings of fact under Issue No. 1 are incorporated herein. On September 29, 1963, petitioner *70 embarked on a business trip to four New York cities, Olean, Elmira, Auburn, and Oswego. He expected to be gone about six weeks and, in fact, did not return until November 10, 1963. Normally, petitioner's business trips were of substantially shorter duration. Petitioner had his wife accompany him on the aforementioned extended business trip to do the highway driving, purportedly because of fractures and neck whiplash suffered by petitioner in an automobile accident in 1955, the continued complications therefrom, and his doctor's advice. His wife had never accompanied him on any other business trips. The expenses deducted by petitioner on his tax return included both his own and his wife's food and motel expenses on this trip. Respondent determined that $162 of the food and $83.43 of the motel expenses were allocable to Thelma and disallowed these items. Issue No. 2 - Ultimate Finding of Fact The traveling expenses allocable to Thelma are a personal expense and are therefore not deductible. Issue No. 2 - Opinion Petitioner testified that he continued to be plagued by injuries resulting from an automobile accident in 1955 and that when he was about to depart on an unusually *71 long trip, his doctor advised him to take his wife along to drive his car. He asks us to allow him to deduct his wife's food and motel expenses from that trip. Respondent does not dispute the expenditure of the sums as indicated. Rather, he asks us to find petitioner's testimony unbelievable. Respondent points to the fact that petitioner offered no corroborative evidence as to his injuries or their relationship to the decision to have his wife drive and to minor inconsistencies between petitioner's testimony and data recorded in petitioner's dairy. We see no need to evaluate the credibility of petitioner's testimony because, even assuming the truth of his assertions, his wife's expenses are not deductible. The sums expended for her food and lodging are deductible as a business expense only if she accompanied petitioner for business reasons; that her presence on her husband's business trip may have been necessary for the medical reasons constitutes a personal and not a business purpose. Wm. E. Reisner, 34 T.C. 1122 (1960); cf. Alex Silverman, 28 T.C. 1061 (1957), *72 affd. 253 F. 2d 849 (C.A. 8, 1958). Petitioner made no claim in his return or during these proceedings that his wife's traveling expenses should be deductible as a medical expense. See Wm. E. Reisner, supra at p. 1131; cf. Donnelly v. Commissioner, 262 F. 2d 411 (C.A. 2, 1959), affirming 28 T.C. 1278 (1957); Walter E. Buck, 47 T.C. 113 (i966). Thus, the traveling expenses of Thelma are of a personal nature and therefore not deductible. [4]
Decision will be entered under Rule 50. Footnotes
1. The deficiency notice was issued to both petitioner and his wife but only petitioner filed a timely petition.↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise specified. ↩
3. SEC. 3121. DEFINITIONS. (d) Employee. - For purposes of this chapter, the term "employee" means - (1) any officer of a corporation; or (2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; or (3) any individual (other than an individual who is an employee under paragraph (1) or (2)) who performs services for remuneration for any person - (A) as an agent-driver or commission-driver engaged in distributing meat products, vegetable products, fruit products, bakery products, beverages (other than milk), or laundry or drycleaning services, for his principal; (B) as a full-time life insurance salesman; (C) as a home worker performing work, according to specifications furnished by the person for whom the services are performed, on materials or goods furnished by such person which are required to be returned to such person or a person designated by him; or (D) as a traveling or city salesman, other than as an agent-driver or commission-driver, engaged upon a full-time basis in the solicitation on behalf of, and the transmission to, his principal (except for side-line sales activities on behalf of some other person) of orders from wholesalers, retailers, contractors, or operators of hotels, restaurants, or other similar establishments for merchandise for resale or supplies for use in their business operations; if the contract of service contemplates that substantially all of such services are to be performed personally by such individual; except that an individual shall not be included in the term "employee" under the provisions of this paragraph if such individual has a substantial investment in facilities used in connection with the performance of such services (other than in facilities for transportation), or if the services are in the nature of a single transaction not part of a continuing relationship with the person for whom the services are performed.↩
4. We note also that, to the extent of $100 of respondent's disallowance, petitioner's expenses for food while traveling would not be deductible on any basis. Petitioner based his claim exclusively on his diary, which reveals only $1,287.60 for food as against $1,387.60 deducted on the return.↩