ROBERT J. DENISON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent GEORGE F. BAKER, III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Denison v. Commissioner
Docket Nos. 5485-74 5565-74.
United States Tax Court
T.C. Memo 1977-430; 1977 Tax Ct. Memo LEXIS 13; 36 T.C.M. (CCH) 1759; T.C.M. (RIA) 770430; December 22, 1977, Filed Emil Sebetic,Sidney O. Friedman, and Michael A. Varet, for petitioners. Michael A. Menillo, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
1970
1971
5485-74
$ 87,778.00
$293.00
5565-74
137,708.00
0 Petitioner in docket No. 5485-74 having conceded the deficiency for 1971, the issues remaining for our decision are: 1) Whether payments received by petitioners in exchange for their relinquishment of their rights to acquire interests in a corporation are taxable as capital gain or ordinary income; and 2) Whether Baden Securities International Corporation, a small business corporation of which petitioners were shareholders, is entitled to a deduction for automobile expenses and a loss incurred on the sale of an automobile. FINDINGS OF FACT Some of the facts have been *15 stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Robert J. Denison (Denison) is an individual who resided in New York, New York, at the time of filing his petition herein. Petitioner George F. Baker, III, (Baker) is an individual who resided in New York, New York, at the time of filing his petition herein. Both petitioners filed their income tax returns for the year in question with the Office of the Internal Revenue Service at New York, New York. Petitioners were associated in business with Richard B. Nye (Nye). [1] Petitioners and Nye were experienced in security analysis and portfolio management. In 1969, the three men were the sole general partners of First Security Company, a limited partnership with assets of approximately $12,000,000, which was engaged in making equity investments in securities. They were also the sole shareholders of Baden Securities Corporation and Baden Securities International Corporation, which acted as investment advisors to offshore funds, one of which had assets of about $40,000,000. In addition, petitioners and Nye, together with a London bank, were *16 sole shareholders of Woodwall, Incorporated, an investment advisor to an offshore equity fund. City Investing Company ("Investing") is a publicly owned corporation listed on the New York Stock Exchange which is experienced in real estate.In March, 1969, Nye proposed to Investing that it sponsor separate funds which would invest in real estate and securities and that a new corporation be organized, to be owned jointly by Investing and by petitioners and Nye, which would directly or through subsidiaries, manage and render investment advice to these funds. Petitioners and Nye thought the relationship would be beneficial to them because Investing had experience in real estate which they lacked. The proposal was attractive to Investing because petitioners and Nye were well respected and Investing believed their participation would help attract capital. They recorded their agreement in a Memorandum of Understanding ("Memorandum"), dated April 17, 1969, as follows: 1. A new corporation called City Security *17 Corporation ("CSC") will be formed in an appropriate jurisdiction in the United States. The outstanding capital stock of CSC will be owned 62 1/2% by City Investing Company, or a whollyowned subsidiary of City Investing Company, and 37 1/2% [2] by Baden Securities Corporation, or Messrs. Baker, Denison and Nye. 2. Messrs. Baker, Denison and Nye will be entitled, at their election, to one or [sic] three seats on the Board of Directors of CSC and will each become Vice Presidents of CSC. Additional members of the board and officers of CSC may be nominated by City Investing Company. 3. Three funds will be formed: a. an offshore fund to be sold in Europe whose investments will be primarily in United States real estate, b. a domestic real estate trust, to be sold in the United States whose investments will be primarily in United States real estate, and c. a private fund of up to $50,000,000 to be contributed by City Investing Company. 4. All advisory and management functions relating to the above funds will be handled by CSC or wholly-owned subsidiaries of CSC. Such functions will include: a. real estate *18 management; b. real estate brokerage; c. investment advice. 5. It is City Investing Company's intention to build an "in-house" investment management capability and, to that end, City may hire one or more financial analysts or fund managers to become employees of CSC or subsidiaries.Nevertheless, it is understood that Messrs. Baker, Denison, and Nye will be available for investment advisory functions, in their capacity as officers of CSC, for not less than two years from the date the first fund is functioning. 6.It is intended that, at an appropriate time, shares of CSC will be offered to the public and that such offerings may include shares owned by the stockholders of CSC. It was contemplated that the new corporation, City Security Corporation, ("Security"), would have full-time employees to take care of day-to-day operations. Petitioners expected to be available for general advice as to security investments and Investing was expected to be available for general advice as to real estate investments. Neither petitioners nor Investing were to be compensated for these services. Although it was not expected that they would be required to invest much capital, it was *19 understood that petitioners, Nye, and Investing would all contribute their pro rata share to the extent necessary. Security was incorporated on May 19, 1969, and Denison was designated a director. It was agreed that, at least for the time being, petitioners and Nye would not be officers as the Memorandum provided. Stock certificates of Security were not issued until 1973. C. I. Mortgage Group, the only fund that was actually formed, was a domestic real estate trust organized in Massachusetts under a Declaration of Trust on May 15, 1969. Petitioners and Nye participated with Investing in finding personnel to operate Mortgage Group and in meeting with counsel and underwriters with respect to a contemplated public offering of securities of Mortgage Group. Because of unfavorable conditions in the securities market in the summer of 1969, the public offering was postponed. In order to achieve a favorable operating record in the meantime, it was agreed that Mortgage Group, through Lehman Brothers ("Lehman"), should attempt a private placement of its securities to raise $20,000,000. Investing and one of its subsidiaries each invested $5,000,000 in common stock. Petitioners and *20 Nye caused a fund which they managed to invest $2,000,000 in debentures and warrants. In the fall of 1969, market conditions improved and Investing decided to proceed with a public offering of Mortgage Group's securities. In connection with this offering, Investing informed petitioners and Nye that the manager of Mortgage Group would be owned solely by Investing. As a result, petitioners and Nye asserted a claim for breach of contract against Investing. On the basis of estimated earnings of Security and the price-earnings ratio of comparable management companies, they estimated their damages at a couple million dollars. Subsequently, Investing, petitioners, and Nye reached a settlement whereby petitioner and Nye assigned all their interests under the Memorandum to Investing for the sum of $250,000 each. Baden Securities International Corporation ("Baden") was organized by petitioners and Nye in January, 1969, to act as investment advisor to a Netherlands Antilles Fund. They were the sole shareholders of Baden and, except for a brief period in 1970, were also the sole employees. The corporation's office was at 245 Park Avenue, New York, New York, in 1970. For the year at *21 issue, Baden filed a United States Small Business Corporate Income Tax Return. Petitioners' and Nye's activities consisted of meeting with and transporting current and prospective clients (many of whom were wealthy Europeans) and meeting with salesmen, security analysts and other portfolio managers. To provide transportation to these meetings and for clients, Baden purchased a 1969 Cadillac in February, 1970, and hired chauffeurs to drive it. Baden sold the car at a loss on November 16, 1970. OPINION The first issue for our decision is whether the payments received by petitioners from Investing are taxable as capital gains, as petitioners contend, or as ordinary income, as respondent contends. Resolution of this issue depends, first, upon whether the petitioners' rights under the Memorandum constituted capital assets under section 1221 [3] and, second, upon whether the transfer of these rights to Investing constituted sales or exchanges under section 1222. On the first question, respondent argues that petitioners were to receive stock in *22 exchange for services, that the receipt of stock would have been taxable to them as compensation, and that the settlement received in lieu thereof is, therefore, taxable as ordinary income. Petitioners, on the other hand, contend that the stock would have been a capital asset and that an executory contract to acquire a capital asset is itself a capital asset. It is well settled that an amount received as a substitute for ordinary income is taxable as ordinary income even though a property right has technically been transferred. See Hort v. Commissioner,313 U.S. 28 (1941); Commissioner v. P. G. Lake, Inc.,356 U.S. 260 (1958). Similarly, there is no question that an executory contract to acquire a capital asset is itself a capital asset. Turzillo v. Commissioner,346 F.2d 884 (6th Cir. 1965), revg. T.C. Memo. 1963-317; Dorman v. United States,296 F.2d 27 (9th Cir. 1961). The question is, thus, factual, namely, whether petitioners were to receive stock of Security as compensation for services or as the fruits of an anticipated capital investment. See Buena Vista Farms, Inc. v. Commissioner,68 T.C. 405, 411-412 and n.8 (1977). *23 That the sums were received by petitioners by way of a settlement of their rights does not change the essential nature of that question. See Gidwitz Family Trust v. Commissioner,61 T.C. 664, 672 (1974). In our view, the record herein clearly demonstrates that petitioners' interests under the Memorandum were to acquire investments in the stock of Security, i.e., in the nature of a joint venture with Investing. As prospective shareholders, they were expected to make proportionate contributions to the capital of Security, albeit that the operations of Security were to be highly leveraged. Cf. Carriage Square, Inc. v. Commissioner,69 T.C. 119 (1977), and particularly the concurring opinions therein. To be sure, the Memorandum provided that petitioners were to be available "for investment advisory functions, in their capacity as officers." But, the day-to-day operations of Security were to be handled by an in-house staff and petitioners were fully occupied in running their other businesses. Moreover, in point of fact, they never did become officers. Under all the circumstances, we are satisfied that whatever services petitioners were expected *24 to perform were those normally expected of investors and were incidental to their status as equity owners. [4]
In short, we are satisfied that the instant case falls within the principles upon which the decisions in Turzillo v. Commissioner,supra, [5] and Dorman v. United States,supra, rest. [6] In James v. Commissioner,53 T.C. 63 (1969), relied upon by respondent, this Court found that, in the circumstances of that case, the stock received by the taxpayer was in exchange for services. It is, therefore, distinguishable. *25 Respondent next contends that, even if petitioners' interests constituted capital assets, they still are not entitled to capital gains treatment on the ground that the transfer of their rights under the Memorandum did not constitute a "sale or exchange" as required by section 1222. Petitioners' rights were not extinguished leaving nothing to be transferred to Investing, as respondent contends. To the contrary, petitioners' right to acquire a 28.6 percent interest in Security passed to Investing just as surely as if actual stock had been transferred. Turzillo v. Commissioner,supra.See United States Freight Company v. United States,422 F.2d 887, 892-893 (Ct. Cl. 1970). Accord Commissioner v. Ferrer,304 F.2d 125 (2d Cir. 1962), modifying 35 T.C. 617 (1961). The fact that Investing simply enlarged its participation in Security does not require a different result. Commissioner v. Ferrer,supra at 130-131. The transaction was a transfer of petitioners' contractual rights to Investing and the fact that Investing's economic position was the same as it would have been if the rights had been released *26 directly to Security is beside the point. See Kuper v. Commissioner,533 F.2d 152, 156-157 (5th Cir. 1976), revg. on other grounds 61 T.C. 624 (1974), and cases discussed thereat. [7] See also, Bittker & Eustice Federal Income Taxation of Corporations and Shareholders (3d Ed. 1971), sec. 9.25. Finally, respondent argues for the first time on brief, that the payments to petitioners amounted to extortion and are, therefore, taxable as ordinary income under Rutkin v. United States,343 U.S. 130 (1952). Respondent purports to find evidence of extortion in petitioners' testimony that their leverage in the settlement negotiations lay in their ability to inform the SEC that the October 30, 1969, prospectus was erroneous in that it failed to reflect their interests under the Memorandum. We think respondent's interpretation is unreasonable. The record, read as a whole, shows that Investing had decided it wanted full ownership of the venture and that it was willing to buy out petitioners' interests in order to enable it to proceed. There is simply no evidence *27 of extortion. Cf. Gidwitz Family Trust v. Commissioner,supra.
The second issue for decision is whether Baden, a small business corporation, is entitled to deduct automobile expenses as an ordinary and necessary business expense under section 162(a) and to deduct a loss incurred on the sale of the same automobile under section 165(a).
Respondent does not question the amounts of the claimed deductions nor does he seem to question that some type of transportation was an appropriate component of Baden's business. Rather, the main thrust of his argument is that the use of a chauffeured Cadillac by Baden was extravagant and that, as a consequence, petitioners have failed to sustain their burden of proof. We reject respondent's position to the extent that it seeks to engraft a per se exception of "extravagance" to the usual rule of what is otherwise considered a legitimate expenditure in connection with a business. This Court has on several occasions held that the expenses of a chauffeur driven automobile were deductible. Estate of Bartholomew v. Commissioner,4 T.C. 349, 362 (1944); Miller v. Commissioner,29 B.T.A. 1061, 1070 (1934); *28 Kay v. Commissioner,10 B.T.A. 534 (1928). Compare Buck v. Commissioner,47 T.C. 113, 120 (1966). And, respondent himself has rejected any such exception in the area of entertainment expenses under section 274. See Rev. Rul. 63-144, 1963-2 C.B. 129, 137. We have evaluated the record herein (including the testimony of the witnesses whom we saw and heard) recognizing that there is no "verbal formula that will provide a ready touchstone" for decision. See Welch v. Helvering,290 U.S. 111, 115 (1933). We have taken into account the nature of Baden's business, the fact that many of its clients were wealthy Europeans and the generally obnoxious traffic situation in midtown and lower Manhattan (an element which, we think may properly be said to be within the ambit of "experience with the mainsprings of human conduct," see Commissioner v. Duberstein,363 U.S. 278, 289 (1960)). On the basis of the foregoing, we conclude -- albeit without enthusiasm -- that petitioners have satisfied their burden of proof that the expenditures in question met the standards of "ordinary and necessary" laid down in Deputy v. Dupont,308 U.S. 488 (1940) *29 and Welch v. Helvering,supra.In so concluding, we recognize that there appears to have been some use of the automobile by petitioners and Nye which might be characterized as "personal" (see section 262), but we think that, as far as the record herein is concerned, such use was so "distinctly secondary and incidental" that it can be ignored as de minimis. See International Artists, Ltd. v. Commissioner,55 T.C. 94, 104 (1970). Having found that the automobile was, for all practical purposes, used entirely in the business of Baden, there is no question but that Baden is entitled to a deduction under section 165(a) for the loss incurred on its sale. Riss v. Commissioner,57 T.C. 469 (1971), modifying 56 T.C. 388 (1971), relied upon by respondent, involved property used primarily for the benefit of the corporate taxpayers' shareholders and is, therefore, clearly distinguishable. See also, International Trading Co. v. Commissioner,484 F.2d 707 (7th Cir. 1973), revg. 57 T.C. 455 (1971). Decision in docket No. 5485-74 will be entered under Rule 155.
Decision in docket No. 5565-74 will *30 be entered for petitioner. Footnotes
1. Richard B. Nye v. Commissioner,↩ docket No. 5487-74, was dismissed on April 2, 1976, for lack of jurisdiction in the absence of a proper statutory notice of deficiency.
2. Later reduced by mutual agreement to 28.6 percent.↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question.↩
4. There is some evidence that petitioners' reputations as investment advisors were an element in attracting Investing to the contemplated project. But, Investing's reputation was a similar countervailing element which influenced the petitioners. In any event, we seriously question whether the element of reputation can sustain a finding of ordinary income on the part of a co-investor who is obligated to pay full value for his investment. Cf. Hunley v. Commissioner,T.C. Memo. 1966-66↩.
5. The reversal of our decision (T.C. Memo. 1963-317) simply represents the fact that the Court of Appeals took a different view of the evidence. See Putchat v. Commissioner,52 T.C. 470, 476 (1969), affd. per curiam 425 F.2d 737 (3d Cir. 1970). Cf. Finney v. Commissioner,253 F.2d 639 (9th Cir. 1958), revg. in part T.C. Memo. 1956-247↩. 6. See also Crisp v. Commissioner,T.C. Memo. 1973-6↩.
7. See also, Revzin v. Commissioner,T.C. Memo. 1977-68↩.