JAMES AND MARTHA KUPER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CHARLES AND KATHLEEN KUPER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 309–72, 384–72. Filed February 4, 1974.

---

*Towner Leeper*, for the petitioners.
*Thomas J. Miller*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies for the taxable year 1966 in the Federal income taxes of petitioners James Kuper (James) and Martha Kuper (Martha) and petitioners Charles Kuper (Charles) and Kathleen Kuper (Kathleen) in the respective amounts of $15,079.02 and $14,034.95.

The issues for determination by the Court are as follows: (1) Whether the series of transactions in 1966 by which petitioners acquired a majority stock ownership in Kuper Volkswagen, Inc. (Kuper Volkswagen), and by which George Kuper (George) acquired a 100-percent stock ownership in Kuper Enterprises, Inc. (Enterprises), should substantively be treated as an exchange of stock taxable at capital gains rates to petitioners[1] and (2) whether Kuper Volkswagen's purported capital contribution of $42,513.54 to Enterprises in 1966 in effect constituted a constructive dividend to petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

James and Martha are husband and wife who resided in El Paso, Tex., at the time of the filing of their petition herein. They filed a joint income tax return with the district director of internal revenue at Austin, Tex., for 1966.

Charles and Kathleen are husband and wife who resided in San Antonio, Tex., at the time of the filing of their petition herein. They filed a joint income tax return with the district director of internal revenue at Austin, Tex., for 1966.

James and Charles are brothers. George, who died in 1971, was also James' and Charles' brother. Charles is the eldest brother; George was the middle brother; and James is the youngest. Their father died in 1941 when Charles was 21 and Charles has been a father to James (and George during George's lifetime) since that time. George and James did not have comparable business education experience. George was not a college graduate; James possesses both a master's degree in public administration and a Ph. D.

---

[1] The issue of whether these transactions resulted in capital gains to George is not before this Court at this time.

Kuper Volkswagen was organized as a corporation under the laws of Texas on August 16, 1955. Kuper Volkswagen operates an automobile dealership in El Paso, Tex.

The organizational structure for the importation and distribution of Volkswagen vehicles in 1965 was as follows: Volkswagen Werk in Wolfsberg, Germany, owned a subsidiary, Volkswagen of America, which distributed Volkswagens throughout the United States through distributors, some of which were wholly owned by Volkswagen of America. Intercontinental Motors Corp. (Intercontinental) was the distributor for a five-State area, including Texas and New Mexico. Intercontinental's president was William J. Dick (Dick) ; its district manager in charge of dealerships in the various cities was Rex Yates (Yates). Yates called on Kuper Volkswagen monthly.

Prior to March 1, 1966, Kuper Volkswagen had outstanding only one class of stock, which consisted of 5,570 shares of common stock. These shares were owned as follows:

| Owner | Number of shares |
|---|---|
| James | 1, 850 |
| Charles | 1, 850 |
| George | 1, 850 |
| Paul Harris | 200 |

George was president of Kuper Volkswagen; James was vice president; and Charles was a member of the board of directors.

James and George disagreed on many aspects concerning the operation and management of Kuper Volkswagen. For example, James frequently concluded that the purchase of used equipment was justified in situations where George felt that new equipment should be purchased. Moreover, George and James also differed on the conduct of the used-car phase of the business. George wanted to floor plan the used cars, considering it a form of leverage. James believed that floor planning used-car stock was "the kiss of death in the car business" and that it was not leverage in any sense of the word. Finally, James believed in profit centers (a concept he had learned during his previous employment as a management trainee with another corporation) which would supply each department of the business with the necessary tools or equipment. George did not believe in profit centers.

Charles was aware of the disputes between George and James as to the management of Kuper Volkswagen and made several calls and visits to El Paso with respect to this problem.

Enterprises was organized as a corporation under the laws of Texas on August 16, 1960. Enterprises operated as a realty corporation with ownership of certain buildings and land that it leased to Kuper Volkswagen. Prior to February 28, 1966, Enterprises had outstanding only one class of stock, which was common stock. The shares were owned equally, one-third each by James, Charles, and George. James and

Charles had an adjusted basis of $6,666.66 each in their Enterprises stock. The operations of Enterprises were routine and consisted of collecting rent and making insurance and mortgage payments. James and George had no disputes as to the management of Enterprises.

In 1965, James concluded that he wanted to obtain a small dealership in another city. He contacted Yates, the district manager of Intercontinental, with respect to such a possibility. James was aware of Volkswagen of America's rule that the same person could neither manage nor invest, directly or indirectly, in two different Volkswagen dealerships.

In the fall of 1966, Len Kinsey, the owner-manager of the Volkswagen dealership in Las Cruces, N. Mex., died. At that time a widow had no contract right to continue the dealership even if she could obtain adequate management, so the Las Cruces dealership was technically available for acquisition by an outside party. James contacted Yates about the possibility of his obtaining the Las Cruces dealership. Yates was hesitant, since the El Paso and Las Cruces territories were contiguous and he was not sure whether the company would let two brothers own adjacent territories. However, Yates concluded that, since George and James were not getting along, they would be strong competitors.

Shortly thereafter, Dick, president of Intercontinental, and Charlie Arschall, a principal investor in Intercontinental, came through El Paso enroute to Len Kinsey's funeral and James reiterated his arguments for permitting him to acquire the Las Cruces dealership. Subsequently, Dick summoned James and George to San Antonio and advised them that James was to retain the El Paso franchise and that George was to acquire the Las Cruces franchise.

A meeting was immediately set up in El Paso and was attended by Charles, Gordon George (a CPA representing Charles), George, James, Albert Cox (the CPA for Kuper Volkswagen), and James' and Charles' attorney.

The participants at the meeting structured the transactions by which George's interest in Kuper Volkswagen was to be terminated. This ultimate result was achieved as follows:

(1) On February 28, 1966, James, Charles, and George contributed all of their individually owned stock in Enterprises to Kuper Volkswagen's capital;

(2) Kuper Volkswagen's board of directors concurrently agreed that Kuper Volkswagen would make a cash contribution of $57,228.71 to Enterprises' capital;[2] and

---

[2] The actual amount to be contributed by Kuper Volkswagen to Enterprises' capital was subject to adjustment. After months of negotiation, the actual cash contribution agreed upon was $42,513.54. Kuper Volkswagen's cash contribution to Enterprises' capital was made to equalize Enterprises' value at one-third that of Kuper Volkswagen's.

(3) On March 1, 1966, Kuper Volkswagen transferred all of its stock in Enterprises to George in exchange for all of his stock in Kuper Volkswagen.

After the events of February 28, 1966, and March 1, 1966, George owned 100 percent of the stock of Enterprises and he continued the operation of the corporation, which is still in existence. Of the 3,900 shares of Kuper Volkswagen outstanding after the events of February 28, 1966, and March 1, 1966, James and Charles each held 1,850 shares and Paul Harris (Harris) held 200 shares. The 1,850 shares previously held by George were now held in treasury by Kuper Volkswagen. On September 24, 1966, Kuper Volkswagen purchased Harris' 200 shares for $9,414.41, leaving James and Charles as Kuper Volkswagen's sole remaining shareholders.

George acquired the Volkswagen dealership in Las Cruces, N. Mex., for $72,865.29 on January 6, 1966.

In his statutory notices mailed October 29, 1971, respondent determined that James and Charles each received a dividend from Kuper Volkswagen of $14,171.18, being one-third of the capital contribution of $42,513.54 transferred from Kuper Volkswagen to Enterprises. By amended answer, respondent alleged that the dividend was $21,256.77 to each. The statutory notices also claimed that James and Charles each exchanged their stock in Enterprises for George's stock in Kuper Volkswagen and accordingly realized capital gain upon such exchange. Finally, respondent in his statutory notice to George dated October 29, 1971, determined that George had also realized $14,171.18 in dividends from Kuper Volkswagen and had realized capital gain on the exchange of his Kuper Volkswagen stock for stock in Enterprises; however, the determination set forth in this statutory notice was not petitioned to this Court, and no refund claim has been filed with respect to that determination.

#### ULTIMATE FINDINGS OF FACT

Petitioners' contribution of their stock in Enterprises to Kuper Volkswagen and Kuper Volkswagen's subsequent purported redemption of George's entire interest in Kuper Volkswagen in substance constituted a taxable exchange of stock between petitioners and George.

Kuper Volkswagen's transfer of $42,513.54 to Enterprises was motivated by a valid corporate business purpose and, accordingly, was a justifiable nonshareholder contribution to capital.

#### OPINION

The first issue presented to this Court in the instant case is whether the method by which petitioners increased their stock ownership in Kuper Volkswagen in 1966 to 94.9 percent should be treated as an

exchange of stock taxable to petitioners at capital gains rates under sections 61(a) and 1002 of the Internal Revenue Code of 1954.[3]

Prior to March 1, 1966, petitioners and George each owned 1,850 shares of the outstanding 5,750 shares of Kuper Volkswagen's common stock [4] and one-third of the common stock of Enterprises.[5] For some years prior to 1966 the effective operation of Kuper Volkswagen had been adversely affected by substantial differences in managerial philosophy between James and George. In order to resolve this internal conflict, George accepted Intercontinental's offer in the latter part of 1965 to acquire the Las Cruces Volkswagen dealership and concomitantly agreed to relinquish his interest in Kuper Volkswagen.[6] This latter objective was achieved by a series of transactions in February and March of 1966. Pursuant to these transactions, petitioners and George contributed all of their Enterprises stock to Kuper Volkswagen; Kuper Volkswagen contributed $57,228.71 [7] to Enterprises' capital to equalize Enterprises' value at one-third of Kuper Volkswagen's value; and, finally, Kuper Volkswagen used the Enterprises stock as consideration for its purported redemption of George's complete interest in Kuper Volkswagen.

Respondent contends that, in substance, petitioners should be characterized as having engaged in a taxable exchange of their stock in Enterprises for George's stock in Kuper Volkswagen. Petitioners, on the other hand, contend that each of the instant transactions constituted a separate and distinct step justifiable by a valid corporate business purpose, and that these transactions should not, therefore, be collapsed to produce a taxable exchange of stock at the stockholder level. Moreover, petitioners further contend that since petitioners did not formally obligate themselves to acquire George's stock in Kuper Volkswagen, the acquisition of such stock from George by Kuper Volkswagen did not relieve petitioners of a personal obligation and, thus,

---

[3] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.

SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items :

*　　　*　　　*　　　*　　　*　　　*　　　*

(3) Gains derived from dealings in property ;

SEC. 1002. RECOGNITION OF GAIN OR LOSS.

Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

[4] Paul Harris owned the remaining 200 shares.

[5] In addition to their respective stock interests in Kuper Volkswagen, George was president and James was vice president of Kuper Volkswagen.

[6] George's relinquishment of his interest in Kuper Volkswagen was necessitated by Volkswagen of America's rule that the same person could neither manage nor invest, directly or indirectly, in two distinct Volkswagen dealerships.

[7] This amount was subsequently adjusted downward to $42,513.54 in October 1966.

should not be construed as creating constructive dividend consequences to petitioners.

After carefully reviewing the entire record, we have concluded that the contribution by petitioners and George of all of their Enterprises stock to Kuper Volkswagen's capital on February 28, 1966, and the subsequent usage by Kuper Volkswagen of the contributed Enterprises stock on March 1, 1966 (i.e., 1 day after the receipt of such stock by Kuper Volkswagen), to "redeem" George's complete interest in Kuper Volkswagen were merely component parts of a single transaction. *Redwing Carriers, Inc.* v. *Tomlinson*, 399 F.2d 652, 654 (C.A. 5, 1968), affirming an unreported Middle District of Florida District Court decision; *Portland Manufacturing Co.*, 56 T.C. 58, 77 (1971); *S. Nicholas Jacobs*, 21 T.C. 165, 169 (1953), affd. 224 F.2d 412 (C.A. 9, 1955); *Kimbell-Diamond Milling Co.*, 14 T.C. 74, 80 (1950), affirmed per curiam 187 F.2d 718 (C.A. 5, 1951); *John Simmons Co.*, 14 T.C. 29, 32 (1950). The contribution of Enterprises' stock to Kuper Volkswagen and the later redemption by Kuper Volkswagen of George's Kuper Volkswagen stock were simply steps in a circuitous route deliberately taken in the futile hope of disguising the fundamental nature of the underlying stock-for-stock exchange transaction at the shareholder level. See *Griffiths* v. *Commissioner*, 308 U.S. 355, 358 (1939); *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938).

The transparency of the February 28 and March 1 transactions is illustrated by the fact that the Enterprises stock was distributed to George in the purported redemption transaction only *one* day after Kuper Volkswagen had received such stock from petitioners. Since the Enterprises stock was designed from the outset to remain in corporate solution at the Kuper Volkswagen level for only 1 day, we can find neither a valid business purpose nor a justifiable legal significance for structuring these transactions in this manner. Accordingly, we are persuaded that the only conceivable purpose of the transactions involving the contribution of Enterprises stock to Kuper Volkswagen and Kuper Volkswagen's purported redemption of George's interest was to avoid any tax consequences at petitioners' level.

We recognize that a taxpayer has the right to structure his affairs in order to minimize the tax consequences resulting from participation in a specific transaction. See *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935). Nevertheless, as this Court stated in *Portland Manufacturing Co.*, *supra* at 77:

this means a taxpayer may resort to tax planning, and not alchemy whereby mixing a brew of incorporation, conveyance, and liquidation, and incanting the language of deeds, bills of sale, and corporate minutes, a taxable exchange is changed into a tax-free reorganization.

Similarly, in the instant case, we will not permit petitioners to take what is essentially a taxable exchange and by utilization of artificial

transactional formalities convert it into a redemption with no tax consequences to petitioners.[8]

Petitioners argue, in effect, that the transitory period of time in which the Enterprises stock rested in Kuper Volkswagen's corporate hands should not govern the determination of whether the February 28 and March 1 transactions possessed the requisite corporate business purpose. Petitioners support this argument by contending that petitioners' contribution of their Enterprises stock to Kuper Volkswagen was essential to increase Kuper Volkswagen's capital to a level which would insure that the ultimate redemption by Kuper Volkswagen of George's stock interest would not adversely affect its working capital. Although this contention has superficial appeal, we are not convinced by it. If Kuper Volkswagen had been concerned only with working capital considerations, it could have financed the redemption by long-term third-party commercial borrowings or by issuance of long-term promissory notes to George.[9] However, petitioners did not permit Kuper Volkswagen to use a long-term debt vehicle, but instead structured the transactions in a manner in which they ended up with 94.9-percent (and ultimately 100-percent) control of Kuper Volkswagen, and George ended up with 100-percent control of Enterprises. We cannot assume that this ultimate result was merely coincidental. To the contrary, we are persuaded that the primary underlying purpose of the pertinent transactions was to eliminate simultaneously George's interest in Kuper Volkswagen and petitioners' interests in Enterprises. Accordingly, we have concluded that the February 28 and March 1 transactions were tortured attempts to transmute what was inherently a taxable exchange of stock between George and petitioners into a redemption with no taxable incidents to petitioners.[10]

[8] Since George's stock in Kuper Volkswagen, and not petitioners', was redeemed, and since petitioners claim that petitioners had no personal responsibility to purchase George's stock in Kuper Volkswagen, petitioners would not have sustained any taxable event if this Court were to permit the form of the transactions to govern their inherent substance. See, e.g., *Wall* v. *United States,* 164 F.2d 462 (C.A. 4, 1947) ; *Holsey* v. *Commissioner,* 258 F.2d 865 (C.A. 3, 1958). This Court will not permit such a result under the facts of the instant case. See *Portland Manufacturing Co.,* 56 T.C. 58 (1971).

[9] Since working capital computations measure current assets in relation to current liabilities, long-term indebtedness (with the exception of any installment due currently) would not affect the working capital computation.

[10] Petitioners did not specifically argue the applicability of sec. 355 since the distributee for sec. 355 purposes in the instant case was George and *not* petitioners. However, even if this argument had been asserted to establish by inference that the Feb. 28 and Mar. 1 transactions did not result in taxable consequences to petitioners, we would have been predisposed to reject this argument. We recognize that *Portland Manufacturing Co., supra,* is distinguishable from the instant case by virtue of the fact that the distributing corporation in the instant case was an already existing entity and not a newly created entity. However we do not regard this distinction as significant. To the contrary, we regard *Portland Manufacturing Co.* as being similar in substance to the instant case, since, in both cases, the distributing corporations were used as vehicles for the attempted tax-free separation of cross-interest ownership in two separate, distinct corporate entities.

With respect to the second issue, respondent contends that Kuper Volkswagen's purported contribution of $42,513.54 to Enterprises' capital should be characterized as a constructive dividend to petitioners.[11] We disagree.

Section 301 provides that a distribution of property by a corporation to a shareholder with respect to its stock is, to the extent that the distribution constitutes a dividend as defined by section 316, includable in the recipient shareholder's gross income. Section 316 defines a dividend as any distribution made by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913. Section 317 defines "property" as including money, securities, and any other property.

For tax purposes, a dividend does not have to be formally declared as such by the corporation. *Barbourville Brick Co.*, 37 T.C. 7 (1961). Moreover, it is not essential for the distribution to be made directly by the corporation to its shareholders. *Walter K. Dean*, 57 T.C. 32, 40 (1971). In this context, a distribution by a corporation to a third party in order to benefit a shareholder constitutes a constructive dividend taxable to the shareholder for whose benefit the distribution is made. See *Sparks Nugget, Inc.* v. *Commissioner*, 458 F.2d 631 (C.A. 9, 1972), affirming a Memorandum Opinion of this Court; *Worcester* v. *Commissioner*, 370 F.2d 713 (C.A. 1, 1966), affirming in part a Memorandum Opinion of this Court; *Limericks, Inc.* v. *Commissioner*, 165 F.2d 483 (C.A. 5, 1948), affirming 7 T.C. 1129 (1946).

The appropriate test for determining whether Kuper Volkswagen's purported contribution to Enterprises' capital constitutes a constructive dividend to petitioners is whether the $42,513.54 intercorporate transfer was made primarily for petitioners' benefit. See *Sammons* v. *Commissioner*, 472 F.2d 449 (C.A. 5, 1972), affirming in part a Memorandum Opinion of this Court; *Walter K. Dean, supra* at 40; *W. B. Rushing*, 52 T.C. 888 (1969), affirmed on another issue in *Rushing* v. *Commissioner*, 441 F.2d 593 (C.A. 5, 1971).

We have found, and so hold, that Kuper Volkswagen's transfer of $42,513.54 to Enterprises was primarily motivated by a valid corporate business reason. There is no doubt that Kuper Volkswagen's opera-

---

[11] Respondent's constructive dividend contention is based upon the following syllogistic rationale: (1) As consideration for George's Kuper Volkswagen stock, petitioners initially exchanged their Enterprises stock *plus* an agreement to later pay to George $42,513.54; and (2) Kuper Volkswagen then redeemed from petitioners for $42,513.54 the stock formerly owned by George; (3) petitioners transferred the $42,513.54 to George; and (4) upon receipt of the money by George, he contributed it to Enterprises' capital. Under this theory, petitioners' dividend consequences are attributable to *United States* v. *Davis*, 397 U.S. 301 (1970).

tions were substantially impaired by the continuing extensive differences in George's and James' respective business philosophies. Accordingly, Kuper Volkswagen benefited greatly by transferring the $42,513.54 to Enterprises and, thus, enabling the consummation of the transaction by which one of the conflicting parties' interest (i.e., George's) in Kuper Volkswagen was eliminated. See *Rapid Electric Co.*, 61 T.C. 232 (1973).

We recognize that petitioners did receive a "benefit" from the $42,-513.54 intercorporate transfer from Kuper Volkswagen to Enterprises, since this transfer was an essential ingredient in enabling petitioners to obtain all of George's stock in Kuper Volkswagen.[12] In this context, we have considered that:

(t)he line between shareholder benefit and corporate benefit is not always clear * * * because some expenditures embody both elements; and an indirect [or an incidental] benefit to the shareholder should not by itself be treated as a distribution to him. [Citation omitted. *Sammons* v. *Commissioner, supra* at 452.]

After carefully analyzing the record, however, we have concluded that the shareholder benefit in the instant case was incidental to the intercorporate transfer's primary purpose of eliminating managerial friction in Kuper Volkswagen. Accordingly, we are persuaded that the $42,513.54 intercorporate transfer was a valid contribution of cash by Kuper Volkswagen to Enterprises' capital and that this contribution of capital did not produce constructive dividend consequences to petitioners. Compare *Sparks Nugget, Inc.* v. *Commissioner, supra.*[13]

*Decisions will be entered under Rule 155.*

[12] The inadequacy of the record precludes this Court from determining whether petitioners also derived an economic benefit by virtue of the $42,513.54 intercorporate transfer. The stipulation of facts states merely that the $42,513.54 intercorporate transfer was made to equalize Enterprises' value at one-third that of Kuper Volkswagen. The record does not clarify either whether such equalization in values was based on pretransfer or posttransfer values, or whether the resultant "one-third" value figure for Enterprises was determined solely by reference to Kuper Volkswagen's economic value or by reference to an aggregate of Kuper Volkswagen's *and* Enterprises' economic values.

Nevertheless, even if petitioners did benefit economically by virtue of the $42,513.54 intercorporate transfer, we are convinced that the record as a whole justifies the conclusion that such economic benefit to petitioners was merely ancillary to the valid corporate business purpose which primarily motivated this intercorporate transfer. See *Sammons* v. *Commissioner,* 472 F.2d 449 (C.A. 5, 1972), affirming in part a Memorandum Opinion of this Court.

[13] We are aware that we have treated one component of petitioners' transactions as having a valid corporate business purpose, and the remaining components as *not* having a valid corporate business purpose. This may appear to be paradoxical at first blush. Yet upon careful examination, this result is consistent. We believe that petitioners' transactions, in fact, were comprised of an intrashareholder exchange of stock and an intercorporate contribution to capital. Petitioners' attempts to transmute the intrashareholder exchange of stock into a valid corporate redemption were not accepted by this Court, with the result that a shareholder purpose and not a valid corporate purpose was held to motivate this segment of the transaction. On the other hand, the intercorporate contribution to capital was held to have been motivated by a valid corporate purpose.