James and Martha KUPER and Charles and Kathleen Kuper, Petitioners-Appellants Cross-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee Cross-Appellant.

No. 74–3138.

United States Court of Appeals, Fifth Circuit.

June 9, 1976.

Towner Leeper, El Paso, Tex., for petitioners-appellants.

Scott P. Crampton, Asst. Atty. Gen., Bennet N. Hollander, Atty., Tax Div., Dept of Justice, Gilbert E. Andrews, Acting Chief, Appellate Section, Dept. of Justice, Meade Whitaker, Chief Counsel, Bobby Burns, Atty., I.R.S., Myron C. Baum, Deputy Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., for Commissioner of Internal Revenue.

Before GOLDBERG, DYER and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

Once again we confront taxpayers who have taken a circuitous route to reach an end more easily accessible by a straightforward path. Looking to substance rather than form, we decide that the instant transactions must be taxed for what realistically they are—an exchange of stock and a dividend. The Tax Court heard the present controversy, 61 T.C. 624 (1974), and found a taxable exchange of stock—a determination which we affirm. That same court, however, failed to denominate the cash transfer of corporate funds a dividend, and it is this latter decision which, for the reasons discussed below, we reverse.

## I. THE FACTS

Prior to March 1, 1966, three brothers, Charles, James, and George Kuper, owned in equal shares the outstanding stock of

Kuper Volkswagen, an automobile dealership located in El Paso, Texas.[1] Similarly, these siblings held, pro rata, the entire stock of Kuper Enterprises [hereinafter "Enterprise"], a realty company which leased land and buildings to Kuper Volkswagen.

The Tax Court found that before 1966, James and George had had serious disagreements over "managerial philosophy" which had "adversely affected" the effective operation of Kuper Volkswagen. 61 T.C. at 629. In the fall of 1965, the Las Cruces, New Mexico, Volkswagen dealership became available. James, concluding "that he wanted to obtain a small dealership in another city," id. at 627, made inquiries with respect to the New Mexico franchise. However, the area Volkswagen distributor decided that George, not James, should take over the new operation. George, hoping to resolve the internal conflicts at the El Paso franchise, accepted the distributor's offer. Id. at 629. Because the parent company, Volkswagen of America, did not permit the same person to invest in or manage two distinct Volkswagen dealerships, it became necessary for George to relinquish his Kuper Volkswagen stock. Id. at 627, 629. The brothers accomplished this task by a series of transactions on February 28, 1966 and March 1, 1966.

First, on February 28, James, Charles, and George each contributed their one-third stock interest in Enterprise to Kuper Volkswagen's capital—causing Enterprise momentarily to become a wholly owned subsidiary of Kuper Volkswagen.

Second, on the same day, Kuper Volkswagen's Board of Directors made a cash capital contribution to Enterprise of $42,513.54.[2]

Finally, on March 1, 1966, Kuper Volkswagen exchanged its 100% ownership of Enterprise for George's one-third ownership of Kuper Volkswagen. Id. at 627–28.

As a result of these transactions, the value of Enterprise stock, now held entirely by George, was enhanced by $42,513.54, the amount of the cash contribution from Kuper Volkswagen. Kuper Volkswagen's outstanding stock was reduced by one-third, the stock received from George, and James and Charles now owned 100% of Kuper Volkswagen.

Characterizing these acts as (1) a nontaxable contribution of Enterprise stock to Kuper Volkswagen, (2) a nontaxable cash contribution by Kuper Volkswagen to Enterprise, and (3) a total redemption of George's Kuper Volkswagen stock taxable at the corporate level [3] and to George Kuper individually,[4] petitioners James and Charles Kuper [5] reported no personal income from the

1. Actually Paul Harris owned 3.8% of the Kuper Volkswagen stock before that company purchased his interest in September, 1966. 61 T.C. at 626, 628. Because this outside-the-Kuper-family ownership has no bearing on the issues here, we assume for purposes of our analysis that the three Kuper brothers at all times owned 100% of the Kuper Volkswagen stock.

2. See note 17 infra.

3. In their brief, petitioners claim that "the corporation Kuper Volkswagen would have realized short term capital gain upon redeeming George's stock with the low basis stock of Kuper Enterprises." They also state, however, that Kuper Volkswagen's basis in its Enterprise stock would have been increased by the $42,513.54 capital contribution which occurred moments before the purported stock redemption. Because the Kuper Volkswagen 1966 Income Tax Return was not placed in evidence, we do not know exactly how, and for what amounts,

Kuper Volkswagen originally accounted to the Government for the transactions under scrutiny here.

4. Petitioners apparently would have George taxed on the difference between George's basis in the Kuper Volkswagen stock purportedly redeemed by Kuper Volkswagen and the value of the Enterprise stock received in the redemption. Capital gains rates would be applicable under I.R.C. § 302(b)(3) prescribing the treatment for complete termination by redemption of a shareholder's (George's) interest.

5. In addition, the Commissioner issued a notice of deficiency to George Kuper and his wife. The Commissioner asserted that George had received a constructive dividend from Kuper Volkswagen equal to one third of Kuper Volkswagen's $42,513.54 capital contribution to Enterprise, see note 7 infra, and also had received capital gains to the extent that the fair market value of the Enterprise stock received on

aforementioned transactions. The Commissioner of Internal Revenue disagreed and in October, 1971, determined deficiencies for James and Charles Kuper of $15,079.02 and $14,034.95 respectively. *Id.* at 625. The Commissioner based the deficiency notices on his characterization of the February 28–March 1 events as 1) a taxable exchange of James's and Charles's Enterprise stock for George Kuper's Volkswagen stock [6] and 2) a dividend of $14,171.18 [7] each constructively paid by Kuper Volkswagen to James and Charles Kuper.[8] *Id.* at 628.

At trial, the parties stipulated to the essential facts. In addition, the taxpayers testified briefly. Judge Fay, writing for the Tax Court, found:

> Petitioners' contribution of their stock in Enterprises to Kuper Volkswagen and Kuper Volkswagen's subsequent purported redemption of George's entire interest in Kuper Volkswagen in substance constituted a taxable exchange of stock between petitioners and George.

> Kuper Volkswagen's transfer of $42,513.54 to Enterprises was motivated by a valid corporate business purpose and, accordingly, was a justifiable nonshareholder contribution to capital. 61 T.C. at 628.

The Commissioner appealed from the latter finding and taxpayers cross-appealed, challenging the former determination. Agreeing for the most part with the Commissioner's arguments, we affirm the Tax Court's decision on the first issue and reverse its decision on the second issue.

## II. THE EXCHANGE OF STOCK

As a general rule, the incident of taxation depends on the substance rather than form of the transaction. *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1939); *Griffiths v. Helvering*, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319 (1939); *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474 (1938); *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Crenshaw v. United States*, 5 Cir. 1971, 450 F.2d 472; *Redwing Carriers, Inc. v. Tomlinson*, 5 Cir. 1968, 399 F.2d 652. As Judge Rives stated in *Kanawha Gas & Util. Co. v. Commissioner of Internal Revenue*, 5 Cir. 1954, 214 F.2d 685:

> This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of close-

---

March 1, 1966, exceeded his basis in the Kuper Volkswagen stock surrendered. Neither George Kuper nor his estate filed a petition for redetermination, and thus, the question of George's tax liability is not before this Court. *But see* Section IV. *infra.*

Martha Kuper, James's wife, and Kathleen Kuper, Charles's wife, were parties to the Tax Court proceeding because they had filed joint income tax returns with their husbands. For purposes of this opinion, James and Charles will be referred to as taxpayers/petitioners.

6. The Commissioner asserted that the exchange was taxable at capital gains rates. I.R.C. §§ 61, 1001, 1002, 1221.

7. Originally, the Commissioner asserted deficiencies of $14,171.18 each against the three brothers. Only James and Charles contested the notices, *see* note 5 *supra,* and at trial, the Commissioner amended his complaint to allege a dividend of $21,256.77 each against James and Charles. *See also* Section IV. *infra.*

8. The dividend would be taxable pursuant to I.R.C. §§ 61, 301, 316. The Commissioner proposed the following constructive transactions to account for the dividend transfer: (1) James and Charles exchanged their Enterprise stock and an agreement to pay George $42,513.54 for George's Volkswagen stock; (2) Kuper Volkswagen redeemed from James and Charles, for $42,513.54, the Kuper Volkswagen stock formerly belonging to George; (3) James and Charles transferred $42,513.54 to George in fulfillment of their obligation incurred in (1) above; (4) George contributed the $42,513.54 to Enterprise's capital. Under this structuring, James and Charles would have received a dividend in (2) above. *See United States v. Davis,* 397 U.S. 301, 90 S.Ct. 1401, 25 L.Ed.2d 323 (1970); 61 T.C. at 632 n. 11. We need not comment on this constructive pattern, however, since we have chosen to account for the dividend in another matter. *See* note 19 *infra.*

**156**

ly related steps in such a plan are merely the means by which to carry out the plan and will not be separated. *Id.* at 691.

Moreover, courts have repeatedly observed that "a given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474, 477.

▪ Relying on these principles, the trial judge concluded, and we agree, that taxpayers' acts were

> merely component parts of a single transaction. [citations omitted]. The contribution of Enterprises' stock to Kuper Volkswagen and the later redemption by Kuper Volkswagen of George's Kuper Volkswagen stock were simply steps in a circuitous route deliberately taken in the futile hope of disguising the fundamental nature of the underlying stock-for-stock exchange transaction at the shareholder level. 61 T.C. at 630.

Petitioners criticize this refusal to recognize the integrity of each of the individual steps of the transaction. They argue that taxpayers are permitted to arrange their tax affairs so as to minimize the amount owed to the Federal Government. Unquestionably the taxpayer has a legal right to plan his business activities in the light of the tax laws. *Gregory v. Helvering*, 292 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 599 (1935). The Commissioner, however, must accept the form and accompanying legal characterization of taxpayer's business transactions only insofar as they are comprehended within the intention of the pertinent revenue statutes. *Id.* We do not believe that Congress intended that under the circumstances of the present case taxpayers could utilize this series of steps to artificially avoid the tax incidents of a simple stock exchange. As Chief Judge Brown said in *Crenshaw v. United States*, 5 Cir. 1971, 450 F.2d 472, where the Court refused to examine the discrete parts of a transaction except insofar they constituted a substantive whole:

> [Taxpayers] cannot compel a court to characterize the transaction solely upon

the basis of a concentration on one facet of it when the totality of circumstances determines its tax status. The most obvious answer to Taxpayer's argument that the parties' characterization is conclusive is that such a result would completely thwart the Congressional policy to tax transactional realities rather than verbal labels . . . Otherwise, form, rather than substance, would invariably prevail. *Id.* at 477–78.

This approach is especially proper where, as here, it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts, all of which when seen together substantively form a taxpayer level stock swap.

Taxpayers assert that we confront here an ordinary Congressionally approved total redemption of George's Kuper Volkswagen stock pursuant to I.R.C. § 302(b)(3) under which the selling stockholder [George] receives capital gains and the remaining shareholders experience no tax effect. *See* note 4 *supra*. Specifically, petitioners argue that the corporation did not undertake any "primary and personal obligation" of the buying shareholders "to buy out the selling shareholder" and thus did not come within the scope of the Fourth Circuit's holding in *Wall v. United States*, 1947, 164 F.2d 462 (finding a dividend where the corporation paid a share holder's debt which the latter had incurred in conjunction with the purchase of stock from another shareholder.) Clearly, *Wall* has been utilized in this Circuit to find dividend equivalency. *See Griswold v. Commissioner of Internal Revenue*, 5 Cir. 1968, 400 F.2d 427. Our decision, however, is not premised on a determination that Kuper Volkswagen assumed a buying stockholder's personal and pre-existing obligation but instead on our view of the substance of petitioners' actions as a stock exchange. Therefore, taxpayers' contention that they have not violated the *Wall* holding, although perhaps true, cannot alter the result in this case.

Moreover, so called "bootstrap" cases including *Zenz v. Quinlivan*, 6 Cir. 1954, 213

F.2d 914; *Holsey v. Commissioner of Internal Revenue*, 3 Cir. 1958, 258 F.2d 865; *Ray Edenfield*, 19 T.C. 13 (1952)[9]; *see generally* Rev.Rul. 69–608, 1969–2, C.B. 43; B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 9.25 (1971), where an increase in a continuing shareholder's ownership interest is facilitated by corporation redemption of a part or all of the stock of another shareholder whose interest in the corporation is being reduced or terminated, are not determinative of this controversy. The present case is similar to the redemption cases just cited in that *in vacuo* the exchange between Kuper Volkswagen and George can be said to have had the effect of using corporate assets to relieve the cost burden to the buying shareholders (James and Charles). However, except for the $42,513.54 transfer, *see* section III *infra*, the assets used in the exchange (the Enterprise stock) had only the day before the exchange been contributed to Kuper Volkswagen by the Kuper Volkswagen shareholders. To this extent, corporate assets did not really assist in the termination of George's interest in Kuper Volkswagen. Rather, the corporation merely served as a conduit for the shuffling of certificates between the Kuper brothers in a manner which we find does not fall within the intent of the Revenue Statutes. Stated another way, any reliance on the above noted cases is undercut by our refusal to accept taxpayers' fundamental premise— that one aspect of these transactions can be analyzed as a redemption separate and apart from the real overall substance of taxpayers' coordinated actions. *See Redwing Carriers v. Tomlinson, supra.*

A recent Ninth Circuit case, *Portland Manufacturing Co. v. Commissioner of Internal Revenue*, 9 Cir. 1975, 75–1 U.S.T.C. § 9449, lends support for our view of the transaction as a taxpayer level exchange of stock. On the basis of the Tax Court's opinion, 56 T.C. 58 (1971), the Court of Appeals affirmed decision in a case analogous to the one presently before this Court. Two companies, Portland Manufacturing Company [Portland] and Simpson Redwood Company [Simpson] were each 50% owners of Springfield Lumber Mills, Inc. [Springfield] and of an unincorporated business, Albany-Plylock [Plylock]. Differences of opinion regarding the "operations and conduct of the businesses of Plylock and Springfield," *id.* at 67, arose between Portland and Simpson. Because of these differences, the co-owners decided to separate their interests completely. They contemplated an end result in which Simpson would acquire Portland's 50% holding in Plylock and Portland would receive Simpson's 50% interest in Springfield. However, instead of undertaking a simple exchange of stock for assets, the parties engaged in a complicated series of transactions in which Portland asserted that it its only corporate act was a capital contribution of its Plylock holdings to Springfield.[10] The Commission-

---

9. *Zenz* involves the tax treatment of the selling shareholder; *Holsey* and *Ray Edenfield* involve the tax treatment of the buying shareholder.

10. The actual transaction in *Portland* was described by the Ninth Circuit court as follows:

    1. In mid-December, 1961, Redwood caused Albany Plywood Corporation (Albany, Inc.) to be organized.

    2. On December 29, 1961, Redwood transferred its interest in Albany, unincorporated, to Springfield.

    3. On January 2, 1962, Portland transferred its half interest in Albany, unincorporated, to Springfield. Thus, on the record, Springfield, at least for an instant, owned all of Albany, unincorporated, and on the same day:

    4. Springfield transferred the Albany assets (Albany, unincorporated) to Albany, Inc., for all of the stock of the latter, and on the same day:

    5. Springfield as a quid pro quo transferred all of the Albany (Inc.) stock to Redwood for the Springfield stock held by Redwood. The acquisition of Springfield stock by Springfield was called a redemption.

    6. Beginning January 3, 1962, Redwood commenced to liquidate Albany, Inc., and in the liquidation took all of the Albany, Inc., assets into its bowels. And Albany, Inc., was no more.

In detail and degree of artificiality *Portland* does differ from *Kuper*. We do not, however, find these distinctions significant given the congruency of the ultimate goal sought, the general similarity of the means employed, and the tax principles involved in both cases.

er, collapsing the steps, charged Portland with liability for a taxable exchange. Plaintiff sued in the Tax Court where a verdict was rendered for the Government. The Tax Court's opinion said:

> It is clear that because of disagreements petitioner [Portland] and Simpson wanted to separate their interests . . . . Simply put, there was an exchange of interests, and the various steps taken to arrive at the final settlement were but component parts of a single transaction. *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 654 (C.A. 5, 1968), affirming an unreported decision of the District Court (M.D.Fla. 19 A.F.T. R.2d 1253, 67–1 U.S.T.C. par. 9392); S. Nicholas Jacobs, 21 T.C. 165, 169 (1953), affd. 224 F.2d 412 (C.A. 9, 1955); *Kimbell-Diamond Milling Co.*, 14 T.C. 74, 80 (1950), affirmed per curiam 187 F.2d 718 (C.A.5, 1951); *John Simmons Co.*, 14 T.C. 29, 32 (1950). . . .

To be sure, a taxpayer has the right to arrange his affairs so as to reduce the amount of tax incident to a transaction. *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 599 (1935). However, this means a taxpayer may resort to tax planning, and not alchemy whereby mixing a brew of incorporation, conveyance, and liquidation, and incanting the language of deeds, bills of sale, and corporate minutes, a taxable exchange is changed into a tax-free reorganization.

The artificiality of the transaction is apparent when it is realized that the Plylock assets moved through the corporate hands of Springfield and APC in a matter of days, never pausing long enough to serve any business purpose, until they reached their ultimate destination, Simpson, where, for all we know, they have

remained ever since. We fail to see how any legal significance can be attached to the two momentary stopovers. *Cf. Ragland Investment Co.*, 52 T.C. 867 (1969), affd. 435 F.2d 118 (C.A. 6, 1970).

We find the *Portland* reasoning convincing in the present case where also we encounter a roundabout path, complete with a momentary stopover unnecessary to the achievement of the desired exchange of interests.

■ Seeking to avoid the substance over form contentions discussed above, taxpayers argue that since the Enterprise-Kuper Volkswagen separation of interest was motivated by a valid business purpose, the elimination of managerial friction between George and James, the Government should recognize the integrity of the individual steps. The simple answer to this claim is that a straightforward, taxable stock swap also would have accomplished this business objective. A legitimate business goal does not grant taxpayer *carte blanche* to subvert Congressionally mandated tax patterns. *See United States v. Ingalls*, 5 Cir. 1968, 399 F.2d 143, 146. Moreover, we note that the same business purpose asserted here—the need to free the business of management conflict—did not sanctify taxpayer's actions in *Portland*.

The Kupers further contend that not only the end result but also the exact structuring of the three-step arrangement was dictated by a valid business purpose. Specifically, petitioners assert that Kuper Volkswagen could not redeem George's Enterprise stock because such a redemption would have left the Volkswagen company with less working capital than that required by its franchisor. After examining all of the evidence including various tax returns, Kuper Volkswagen's financial statements, and the parties' testimony, the Tax Court rejected this contention.[11] In so acting, the

---

11. Taxpayers pointed to Kuper Volkswagen's December 31, 1965, financial statement in support of their contention that working capital requirements controlled the transaction's structure. These financial statements indicate $109,836 in working capital. The parent company assertedly required a minimum of $95,-100. Petitioners testified that the overall business purpose of divorcing George from Kuper Volkswagen could not be achieved by a straightforward cash redemption of George's Kuper Volkswagen stock because such action would have violated the purported minimum. While this assertion, according to the December 31, 1965, figures entered into evidence, appears true, we note that based on these same

Tax Court emphasized the availability of alternative methods of financing which would not have damaged Kuper Volkswagen's working capital ratio and its own conclusion that in reality "the only conceivable purpose of the transactions involving the contribution of Enterprises stock to Kuper Volkswagen and Kuper Volkswagen's purported redemption of George's interest was to avoid any tax consequences at petitioners' level." 61 T.C. at 630. In other words, taxpayers did not wish merely to exclude George from Kuper Volkswagen ownership, their asserted business purpose, but also had larger tax objectives which ultimately controlled specific form of the transactions. Applying the clearly erroneous standard to the Tax Court's finding of primary purpose and rejection of petitioners' business purpose claim, *see Sammons v. Commissioner of Internal Revenue*, 5 Cir. 1972, 472 F.2d 449, 452; *Chared Corp. v. United States*, 5 Cir. 1971, 446 F.2d 745, 746, and closely scrutinizing the record, we cannot say that that Court erred.[12] Moreover we concur in that Court's conclusion that the discrete steps undertaken here must be seen as an exchange of stock.

As a general matter, it is important to emphasize that we are not saying that the exigencies of business finance can never legitimize the taxpayers' choice of a route different from that favored by the Internal Revenue Service, or that in arranging business dealings taxpayers have no flexibility in structuring their transactions as their judgment deems best. In certain circumstances, the Congress has approved the use of alternative tax and business paths to a given end. *See, e.g.,* I.R.C. §§ 337, 351, 368. However, for this Court to permit taxpayers randomly to piece together the various provisions of the Code unhampered by any limits on the artificiality of their constructions would leave the Congressional taxing scheme in shambles. Because all of the combinations conceivable by a resourceful tax bar cannot be perceived in advance and because the background circumstances vary so greatly from case to case, we are unable to draw a single bright line separating in all instances unacceptable artifice from valid tax planning. Whatever the exact location of this boundary, it is clear that the present taxpayers have crossed over to an area where their transaction must be collapsed, characterized, and taxed on the basis of its substance—a taxable exchange of stock.

## III. THE CONSTRUCTIVE DIVIDEND

The second step in this three-prong transaction involved a transfer of $42,513.54 from Kuper Volkswagen to what was for only a single day that company's wholly owned subsidiary, Enterprise. At trial, the Commissioner sought to characterize the transfer as a constructive dividend of $21,256.77 [13] to James and Charles. In support

---

12. numbers the actually undertaken $42,513.54 cash contribution from Kuper Volkswagen to Enterprise violated the working capital test. Whether the working capital situation had so drastically improved by February 28, 1966, as to obviate this problem with respect to either the rejected idea of a cash redemption or the accomplished cash capital contribution, is not apparent from the evidence. Of course, a simple exchange of stock among the shareholders also would not have affected the working capital ratio.

We observe also that contrary to petitioners' apparent assertion, a contention of corporate inability to finance a transaction in a certain manner, even if accepted by the courts, does not give taxpayers the legal right to structure their dealings in any manner, no matter how artificial, and then force the Commissioner to accept the taxpayer selected structure.

12. The Tax Court's skepticism with respect to the asserted business justification for petitioners' "tortured attempts," *see* 61 T.C. at 630–31, finds adequate support in the oral and documentary evidence. For example, James Kuper testified that the parties agreed that "Kuper Volkswagen would be the one who would be dealing with George" because "it seemed to be the best way to do it, for the taxes involved." *See also* note 11 *supra*. This rejection of taxpayer's argument that a valid primary business purpose motivated their transactional path makes unnecessary a present determination of the circumstances, if any, in which a legitimate business purpose would justify petitioners' legal characterization of the discrete steps. *See* notes 3 & 4 *supra*.

13. *See* note 7 *supra*.

of his position, the Commissioner argued that if the February 28–March 1 transactions were in reality an exchange of stock between George Kuper and petitioners, then it necessarily follows that the $42,513.54 constituted, at the shareholder level, a part of the purchase price for George's Volkswagen stock. Therefore, the petitioners received a direct economic benefit from the transfer. Moreover, this economic benefit was taxpayers' primary purpose for structuring the transaction as they did. As such, dividend treatment is proper under the Fifth Circuit's decision in *Sammons v. Commissioner of Internal Revenue*, 5 Cir. 1972, 472 F.2d 449, where Judge Clark wrote:

> In every case, the transfer must be measured by an objective test [the distribution test]: did the transfer cause funds or other property to leave the control of the transferor corporation and did it allow the stockholder to exercise control over such funds or property either directly or indirectly through some instrumentality other than the transferor corporation. If this first assay is satisfied by a transfer of funds from one corporation to another rather than by a transfer to the controlling shareholder, a second, subjective test of purpose must also be satisfied before dividend characterization results. Though a search for intent or purpose is not ordinarily prerequisite to discovery of a dividend, such a subjective test must necessarily be utilized to differentiate between the normal business transactions of related corporations and those transactions designed primarily to benefit the stockowner. *Id.* at 451.

The Tax Court, although recognizing that dividend denomination does not depend on a formal corporate declaration [14] or a distribution directly to shareholders,[15] rejected the Commissioner's arguments. 61 T.C. at

632. Viewing the transfer independently of the other steps, Judge Fay found that it "was primarily motivated by a valid corporate business reason," *i. e.* the elimination of managerial friction, and that any shareholder benefit was incidental to this primary corporate purpose. *Id.* at 632–33. Thus, the Tax Court reasoned that under the primary benefit test of *Sammons, supra; W. B. Rushing*, 52 T.C. 888 (1969), aff'd on other grounds, *Rushing v. Commissioner of Internal Revenue*, 5 Cir. 1971, 441 F.2d 593; and *Walter K. Dean*, 57 T.C. 32 (1971), the Government failed in its dividend contention. For the reasons stated below, we disagree with the Tax Court and reverse its decision as to the dividend issue.

### A. The Primary Purpose Test.

■ Our review of the case law in this area reveals that although *Sammons* speaks of the subjective intent to primarily benefit the shareholder, the search for this underlying purpose usually involves the objective criterion of *actual* primary economic benefit to the shareholders as well. *See, e. g., Rapid Electric Co.*, 61 T.C. 232 (1973). This objective facet of the *Sammons'* primary benefit test (which inevitably overlaps with the *Sammons'* objective distribution test, *see* Section III.B. *infra.*) is clearly observed in *W. B. Rushing, supra; Commissioner of Internal Revenue v. Offutt*, 4 Cir. 1964, 336 F.2d 483; and *Walter K. Dean, supra*, cases on which *Sammons* relies. As noted above, in the present case the Tax Court made findings as to both the primary economic purpose and the actual primary economic effect, *see* 61 T.C. at 632–33, and we shall examine both of these findings.

When viewed in the context of the overall transaction, we have little doubt but that petitioners' dealings were primarily intended to create and in fact did create a direct and primary economic benefit to the

---

14. *See, e. g., Crosby v. United States*, 5 Cir. 1974, 496 F.2d 1384, 1388; *Barbourville Brick Co.*, 37 T.C. 7, 13 (1961).

15. *See, e. g., Crosby v. United States*, 5 Cir. 1974, 496 F.2d 1384, 1388; *Sammons v. Commissioner of Internal Revenue*, 5 Cir. 1972, 472 F.2d 449; *Casner v. Commissioner of Internal Revenue*, 5 Cir. 1971, 450 F.2d 379; *Sparks Nugget, Inc. v. Commissioner of Internal Revenue*, 9 Cir. 1972, 458 F.2d 631.

Kuper Volkswagen shareholders. Enterprise maintained its subsidiary status for a mere twenty-four hours.[16] During this time, the taxpayers caused Kuper Volkswagen to pay $42,513.54 to Enterprise with the knowledge that control of the latter company and therefore the money would be shifted the next day, all without expectation of repayment to Kuper Volkswagen.[17] Thus, the transitory parent-subsidiary relationship served merely as a conduit for the movement of funds the effect and purpose of which was to lessen the consideration which would have passed from James and Charles to George had there been a simple exchange of stock. The evidence, including a Board of Director's resolution and a stipulation of fact as well as taxpayer's brief makes clear that taxpayers shifted the $42,-513.54 in order to equalize the values of Enterprise at the fraction of Volkswagen's value which would make the subsequent division of Enterprise and Kuper Volkswagen ownership a fair one. The obvious purpose of this equalization was to permit what in substance was a stock swap among shareholders without the need for the shareholders to exchange money directly or to incur taxes at petitioners' level. This benefit to the shareholders with its concomitant shareholder tax savings cannot be deemed indirect, incidental or ancillary.[18]

Because of the deference accorded to the Tax Court pursuant to the clearly erroneous rule, see Sammons, 472 F.2d at 452; Chared Corp., 446 F.2d at 746, we are usually reluctant to substitute our own findings as to primary purpose and benefit for those of the Tax Court. However, in this instance, we are reinforced in our view by Judge Fay's earlier determination, discussed in Section II, supra, and our own conclusion

16. Seeking to support the Tax Court's position, taxpayers suggest that there is nothing unusual in a parent's capital contribution to its wholly owned subsidiary. The parent-subsidiary relationship here was so fleeting that it is questionable whether or not parent-subsidiary is the appropriate characterization. In any event, we observe that even parent-subsidiary transfers are not immune from dividend inquiry. See, e. g., Sammons, supra. Although many cases finding that a transfer between two corporations is equivalent to a dividend involve commonly controlled (brother-sister) corporations, see, e. g., George W. Knipe, ¶ 65, 131 P–H Memo T.C. (1965), aff'd per curiam sub nom. Equitable Publishing Co. v. Commissioner of Internal Revenue, 3 Cir. 1966, 356 F.2d 514; Worcester v. Commissioner of Internal Revenue, 1 Cir. 1966, 370 F.2d 713; see generally B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 7.05 (1971); under Sammons vertical parent-subsidiary transfers are also vulnerable to Internal Revenue Service and court examination.

Much of the litigation in this area has involved the use and interpretation of section 482 of the Internal Revenue Code. See generally, Federal Income Taxation of Corporations and Shareholders, supra, ¶ 15.06. However, neither party here bases its argument on that section, nor need we rely on it for our decision.

17. Originally, on March 1, 1966, the Kuper Volkswagen Board of Directors ordered a cash contribution "of $57,228.71 be paid by this corporation to Kuper Enterprises, Inc. subject to agreement by Kuper Enterprises, Inc. to refund any excess within six months. . . ." This refund provision permitted the immediate con-

summation of the corporate level transaction while allowing the petitioners and George to continue to negotiate for a fair exchange of values. After prolonged discussions, the parties agreed that the amount of the contribution should have been $42,513.54, the sum in controversy here. Accordingly, Enterprise returned $14,715.17 to Kuper Volkswagen.

18. The Tax Court states that its inability to discover whether the $42,513.54 cash contributions equalizing Enterprise's value at one-third of Kuper Volkswagen's was based on pre-transfer or post-transfer values and whether the one-third figure was determined solely by reference to Kuper Volkswagen's economic value or the aggregate of Kuper Volkswagen's and Enterprise's economic values "precludes [the Tax Court] from determining whether petitioners also derived an economic benefit by virtue of the $42,513.54 intercorporate transfer." 61 T.C. at 633 n. 12.

Although the actual dollar figures testified to are not consistent throughout the evidence and although the Board of Directors' resolution probably intended a fraction of one-half and not one-third, it is clear from the language of that resolution and from petitioners' brief that the equalization was based on post-transfer and aggregate economic values. Moreover, whatever the answer to these questions, we think that the mere evidence of an "equalization" transfer in the context of the other steps taken here suffices, by itself, to establish the existence of the requisite economic benefit to taxpayers.

that the other steps in this integrated transaction had no "valid business purpose" and that their only "conceivable purpose" was the avoidance of tax consequences to petitioners. 61 T.C. 630. If the larger purpose of separating out interests in order to obviate management quarrels could not justify the first and third steps in this transaction, it certainly cannot legitimize this inextricably related middle step which, unlike the Tax Court, we refuse to consider apart from the remainder of the taxpayers' actions.

■ We do not hereby contest the Tax Court's factual finding that the $42,513.54 transfer (not to mention the other steps) facilitated a successful separation of the Kuper brothers' interests in Kuper Volkswagen—a primary corporate goal. However, it is not the ultimate motivating factor which is in question but rather the intent behind the specific route by which the larger purpose was accomplished. *See United States v. Ingalls*, 5 Cir. 1968, 399 F.2d 143, 146. The trial court explicitly rejected the broader goal of eliminating managerial friction as a justification for treating the related steps of a stock contribution and purported redemption separately and characterizing them on an isolated basis. Similarly, that broader purpose cannot support discrete analysis of the cash transfer and thereby avoid our conclusion that when seen as a part of a taxpayer level exchange of stock, the $42,513.54 must be regarded as having been intended to benefit as well as having actually benefitted, directly and primarily, the Kuper Volkswagen shareholders.

### B. The Distribution Test

■ Because the distribution of money away from the control of the transferor corporation and into shareholder control usually results in a direct economic benefit to the shareholder, the *Sammons* net distribution test, *see Sammons*, 472 F.2d at 451, 453–54, is closely related to the question of actual direct economic benefit which we have just discussed. In fact, neither party here discussed the distribution test, nor did the Tax Court, although everyone argued about the problem of actual economic benefit. However, we think that in the light of our conclusions in Sections II and III.A., *supra*, it suffices to say that when the present transactions are seen as a taxable shareholder exchange of stock, it is unmistakable that a net distribution of funds from Kuper Volkswagen has occurred and that the transferred funds came within the direct control of the Kuper Volkswagen shareholders who used them for their own benefit as shareholders. Thus, under *Sammons*, dividend treatment is proper, and to this extent the Tax Court's decision is reversed.

### IV. ALLOCATION OF THE DIVIDEND

■ We note that the Commissioner originally charged each of the Kuper brothers with a dividend equal to one-third of the $42,513.54 transferred ($14,171.18) from Kuper Volkswagen to Enterprise. By amended answer, he claimed that James and Charles should have been viewed as having received the entire $42,513.54 ($21,256.77 each). *See* note 7 *supra*. The difficulty with this solution is that it would permit the Internal Revenue Service to collect taxes on $42,513.54 in dividends from James and Charles even though the Service apparently already has received taxes on a dividend of $14,171.18 from George, who never challenged the Commissioner's deficiency determination. *See* 61 T.C. at 628 and note 5 *supra*. A 100% recovery from petitioners here in addition to the former 33⅓% recovery from George would result in the Government's receiving taxes on 133⅓% of the constructive dividend—an overly generous result in the Government's favor. Although the case law lends some support to the Commissioner's amended position that the entire dividend should be attributed to the buyers of the Volkswagen stock, *see, e. g., Casner v. Commissioner of Internal Revenue*, 5 Cir. 1971, 450 F.2d 379, equity requires that the Government not collect double taxes and therefore that we apportion

the dividend as the Commissioner first recommended.[19] The Commissioner's deficiency judgment with respect to the dividend assessment is sustained only to the extent of a dividend of $14,171.18 against each petitioner.

Finally, we reiterate our conclusion that this is not a capital contribution case, nor a redemption case. Instead, we find an exchange of stock and related dividend. In taxation, as in other areas, we take care not to miss the larger forest while too narrowly focusing on the component trees. Thus, of necessity, we have remained alert to the wider vision, lest by a process of artificial atomization, the taxpayer find his way to a tax haven not intended by our lawmakers.

Assuredly, a real business purpose—the need to separate ownership interests in Kuper Volkswagen—motivated the overall transaction here. But it cannot support the specific route followed. Clearly this conclusion is proper for the presence of business discordance cannot be permitted to justify whatever tax construct petitioners deem most beneficial to their tax liability. Were this not the rule, the Commissioner would be left defenseless against the clever tinkerers of the code who by exalting form over substance subvert the purposes inherent in our revenue statutes. AFFIRMED IN PART, REVERSED IN PART.

19. Presumably the Commissioner would construct the transactions as follows: Kuper Volkswagen pays a dividend of $14,171.18 to each of the three brothers; George exchanges his Kuper Volkswagen stock for James and Charles's Enterprise stock and $28,342.36. James and Charles contribute their new Kuper Volkswagen stock to Kuper Volkswagen, of which they are the 100% owners; and George contributes the $42,513.54 to Enterprise, of which he is now the 100% owner.