T.C. Memo. 1997-154


UNITED STATES TAX COURT


DON A. CHAN AND CECILIA CHAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


EASTIMPEX, A CALIFORNIA CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 2993-95, 3058-95.[1]        Filed March 26, 1997.


<u>Wendy Abkin</u> and <u>Richard J. Sideman</u>, for petitioners.

<u>Debra K. Estrem</u>, for respondent.

---

[1] These cases were consolidated for purposes of trial, briefing, and opinion.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined deficiencies in, additions to, and an accuracy-related penalty on Federal income tax for individual petitioners Don and Cecilia Chan as follows:[2]

| | | Additions to Tax | | | | Accuracy-related Penalty |
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6661 | 6662(a) |
| 1987 | $934,911 | --- | $46,746 | [1] | $61,350 | --- |
| 1988 | 708,273 | $35,414 | --- | --- | 30,992 | --- |
| 1989 | 693,857 | --- | --- | --- | --- | $14,667 |

[1] 50 percent of the interest due on the portion of the underpayment attributable to negligence.

Respondent determined deficiencies in and additions to Federal income tax for corporate petitioner Eastimpex for the taxable years ending March 31, 1988 and 1989, as follows:

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1)(A) | 6653(a)(1)(B) | 6661 |
| 1988 | $766,321 | $38,316 | [1] | $191,580 |
| 1989 | 815,234 | --- | --- | 203,809 |

[1] 50 percent of the interest due on the portion of the underpayment attributable to negligence.

After concessions, the issues for decision are:  (1) Whether certain payments by corporate petitioner Eastimpex to its related supplier were costs of goods sold, (2) whether individual

---

[2] All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise designated.

petitioners realized constructive dividends from Eastimpex, (3) whether individual petitioners are liable for additions to tax under sections 6653 and 6661 for 1987 and 1988 attributable to the constructive dividends, (4) whether individual petitioners are liable for an accuracy-related penalty under section 6662 for 1989, (5) whether corporate petitioner is liable for an addition to tax under section 6653(a)(1)(A) and (B) for taxable year ending March 31, 1988, (6) whether corporate petitioner is liable for an addition to tax under section 6661 for taxable year ending March 31, 1988, and (7) whether individual petitioners are liable for additions to tax under sections 6653 and 6661 for 1987 and 1988 for their failure to report interest income from an overseas bank account.

## FINDINGS OF FACT[3]

At the time the petitions were filed, petitioners Don A. and Cecilia Chan (individual petitioners) resided in San Francisco, California, and petitioner Eastimpex (corporate petitioner), a California corporation, had its principal place of business in San Francisco, California. Individual petitioners are married.

Individual petitioners own 100 percent of the stock in corporate petitioner. They began Eastimpex in 1971 and incorporated Eastimpex in 1977. Eastimpex imports oriental food and other goods from Taiwan and elsewhere for sale in the United

---

[3] The parties' stipulation of facts, along with the attached exhibits, is incorporated herein by this reference.

States.  It began as the sales representative of Shin I Food Factory Ltd. (Shin), a Taiwanese oriental food manufacturing company started by petitioner husband's father, Henry S.T. Chan (Henry).  Eastimpex owns the exclusive worldwide distribution rights to Shin products.  During the years in issue, Eastimpex's gross sales were about $20 million, and Shin products accounted for 25 percent of Eastimpex's sales.

While in college in the United States, petitioner husband began selling food manufactured by Shin.  After college, petitioner husband returned to his family in Taiwan to work at Shin for about a year.  At Shin, petitioner husband worked on the manufacturing line and at the head office in export sales, soliciting customer orders.  In the early 1970's, petitioner husband returned to the United States with petitioner wife to work as a sales representative for Shin.

Henry began Shin with Lily Chan (Lily), petitioner husband's mother.  Lily and Henry had three children, petitioner husband and two daughters (the Lily Chan family).  Henry also had four children from his marriage to Wan Yang Chen (the Wan Yang Chen family).

When Shin began, Lily and Henry held the majority of Shin stock, and Henry worked as Shin's general manager.  Their two daughters were each given 10 percent of Shin.  They did not participate in the management of Shin during the years in issue and initially received the stock in order to increase the number

of shareholders.  At Shin's inception, petitioner husband was not made a shareholder because he was attending school in Hong Kong. Stanley Lee (Stanley), Henry's former son-in-law through a daughter from the Wan Yang Chen family, also owned 18 percent of Shin and worked as Henry's assistant.  Otherwise, the Wan Yang Chen family had not been involved in the operations of Shin.

Henry retired as Shin's general manager in 1982 and was replaced by Stanley.  Also, at the time of Henry's retirement, Lily gave petitioner husband a 30-percent share of Shin.  Until mid-1986, petitioner husband and his immediate family owned 75 percent of Shin.  Henry intended for Shin to be a family business; Henry passed away on March 21, 1987.  Petitioner husband is the only one of Henry's children involved in operating Shin.  Petitioner husband has served on Shin's board of directors since 1982 and has been its chairman since 1986.  In 1986, the only board members were petitioner husband, Lily, and Stanley.

During the years in issue, petitioner husband and his immediate family (his mother Lily and his two full sisters) owned slightly over 50 percent of Shin, and petitioner husband was Shin's largest shareholder with 30 percent.  In the late 1980's, Lily gave 3 percent of Shin to Priscilla Tay (Priscilla), petitioner wife's sister.  Both Lily and Priscilla had lived with individual petitioners for a number of years during the 1980's and had developed a close relationship.  Priscilla also worked

for Eastimpex from 1986 to 1988. During the years in issue, Lily owned less than 3 percent of Shin.

Despite petitioner husband's 30-percent ownership, Shin has not paid him a dividend since he became a shareholder. However, other shareholders of Shin have received dividends during that time. In addition, Shin made large, unreimbursed distributions to Lily and distributions to satisfy Lily's contractual obligation at a time when she owned less than 3 percent of Shin.

In 1986, Henry transferred his 18-percent share of Shin to a member of the Wan Yang Chen family, Daniel Chen (Daniel). Also in 1986, a dispute arose between the Wan Yang Chen family and the Lily Chan family as a result of Shin's failing to pay a share of its profits to Wan Yang under a prior agreement. In the prior agreement, it was agreed that Henry, Lily, and Wan Yang would divide Shin's profits equally among them. However, Wan Yang received payments pursuant to the agreement for only 1 or 2 years. Daniel was causing problems at Shin because he felt that the Lily Chan family had acquired too many of Henry's assets to which the Wan Yang Chen family had a right. Daniel also improperly removed some corporate documents from Shin's office. Stanley felt that he could not handle the situation and flew to the United States to tell petitioner husband that he was resigning. Edward Chiu (Edward) replaced Stanley as Shin's general manager. Petitioner husband and Edward met in 1975 through business dealings between Eastimpex and a food supply

company that Edward owned.  Petitioner husband and Edward were close personal friends.  Petitioner husband personally chose Edward to succeed Stanley as Shin's general manager.

When Edward became the general manager, he negotiated a resolution to the family dispute.  At a meeting with petitioner husband and Edward, Der-San Chen, representing the Wan Yang Chen family, voiced his concern that the Lily Chan family had acquired a large portion of Henry's assets.  The Wan Yang Chen family believed that Henry had wished to give it something.  The two families entered into a written agreement (1986 Agreement) which required Lily, petitioner husband, Eastimpex, and Edward to pay $1.25 million to the Wan Yang Chen family.  The agreement did not allocate the payments for which each party would be responsible.  However, it was the parties' understanding that petitioner husband acted only as a guarantor and was liable only if Lily failed to pay.  As part of the agreement, Edward received the 18-percent share of Shin that Daniel had received from Henry.  Edward paid the portion of the $1.25 million payment equal to the value of the 18-percent share of Shin he acquired.

In exchange for the $1.25 million, the Wan Yang Chen family agreed to forgive the failure to make payments to Wan Yang under the prior agreement and to not make any further claims to Henry's assets.  In addition, Daniel returned the improperly removed corporate documents and did not file a criminal complaint that he had prepared alleging that Shin paid excessive commission to

Eastimpex. Daniel had threatened to file the complaint if he was not satisfied with the resolution of the dispute.

Also in 1986, it was decided that a bank account should be opened in the name of Shin to receive payments from Eastimpex at Coast Savings and Loan in San Francisco (Coast). In 1987, the account was moved to First Pacific Bank in Hong Kong (First Pacific). In the business relationship between Eastimpex and Shin, Shin provided a price list for goods. The price list generally contained two handwritten prices under columns headed "EP" and "NP", with the "EP" price being slightly lower than the "NP" price. The amount of the difference between the two list prices varied with each good, and the Shin price list reflected two prices only for goods that Shin manufactured. Shin sold goods to Eastimpex at the lower "EP" price (the invoice price). Eastimpex paid the invoice price to Shin through a letter of credit or wire transfer. A few months later, Eastimpex deposited the difference between the invoice price and the higher "NP" price (the full list price) into the Coast or First Pacific accounts in Shin's name (the deposited amounts).

Eastimpex treated both the invoice price and the deposited amounts as the cost of goods sold on its tax returns for the years in issue and subtracted both amounts from gross receipts to determine gross income. Eastimpex does not have invoices for the deposited amounts. However, Eastimpex's records show the check numbers of the checks used to make the deposits, references to

the original invoice, and the date and amount of each deposit. Although Eastimpex purchased goods from other Taiwanese manufacturers, it used a two-tier payment system only with Shin. No other manufacturer ever requested that Eastimpex pay for goods with two payments. In addition, none of the other manufacturers provided an invoice for an amount less than the amount that Eastimpex paid for goods.

The Coast and First Pacific accounts were subject to periodic reconciliations by Eastimpex and Shin to ensure the deposits were being made. However, Lily or Priscilla held the passbooks from the Coast and First Pacific accounts, and no one at Shin ever saw the passbooks. Shin never received any bank statements concerning the accounts from Coast or First Pacific. Shin did not record the deposited amounts as income on its books and records although it recorded the invoice prices as income. The Coast and First Pacific bank accounts were not listed as assets on Shin's books and records. In addition, Shin reported only the invoice price as income to the Taiwanese Government. Petitioner husband knew that Shin did not report the deposited amounts as income.

The Coast account was opened on August 6, 1986, in the name of "Shin I Food Co."[4] with Edward and Ken Chen, Shin's principal

---

[4] The account number for the Shin I Food Co. at the Coast Savings and Loan in San Francisco changed twice after it opened and became a term account. The signatories and account name remained the same. The term "Coast account" refers to all of
(continued...)

accountant, as signatories. Coast bank was chosen by petitioner husband because it was convenient to Eastimpex's office for making deposits. All deposits to the Coast account were from Eastimpex, drawn on an Eastimpex bank account. All deposited funds remained in the account until it was closed.

On September 14, 1987, a letter was obtained from petitioner husband's office at Eastimpex and delivered to Coast by an Eastimpex employee, directing the Coast account be closed and the balance, totaling $322,200.01, be issued in checks as follows:

| Name | Amount |
|---|---|
| Priscilla Tay (sister of petitioner wife) | $86,651.00 |
| Stanley Lee (Shin's general manager until 1986) | 32,093.00 |
| Edward Chiu (Shin's general manager from 1986) | 48,548.47 |
| Shin I Food Factory Co. | 154,907.54 |

Edward and Ken Chen signed the letter authorizing the closure. The four checks were given to petitioner husband. The check issued to Stanley was deposited into his personal account, and the check issued to Edward was negotiated overseas. The check issued to Shin was endorsed by Lily and deposited in the First Pacific account. The check issued to Priscilla was deposited into an Eastimpex account and then wired to her personal bank account in Hong Kong.

In 1987, the account was opened at First Pacific in the name of "Shin I Food Co." with Edward, Ken Chen, Lily, and Priscilla as signatories. At that time, Eastimpex opened a subsidiary in

---

⁴(...continued)
these accounts.

Hong Kong, and it was decided that the subsidiary would make the deposits. First Pacific was chosen by petitioner husband because it was convenient to the subsidiary. All deposits to the First Pacific account were from Eastimpex, drawn on an Eastimpex bank account.

Funds in the First Pacific account were used to satisfy personal obligations of Lily under the 1986 Agreement. In addition, the two-tier payment system ended in 1990, the same year that the required payments under the 1986 Agreement were completed. One of the payments under the 1986 Agreement was made with a check drawn on the First Pacific account in the amount of $166,687 payable to Daniel Chen. In addition, another payment due under the 1986 Agreement corresponds to a $314,912 distribution from the First Pacific account to Lily in October 1988. The timing and amount of the withdrawal correspond to the timing and amount due to the Wan Yang Chen family under the 1986 Agreement. None of the money in the First Pacific account was withdrawn for business purposes of Shin.

In 1984, petitioner husband and Lily opened an interest-bearing account at Standard Chartered Bank (Standard Chartered) in London with approximately $1.5 million from the sale of real estate located in Canada. Based on their proprietary interest in the real estate, the interest from the Standard Chartered account was attributable 49 percent to petitioner husband and 51 percent to Lily. In 1989, petitioner husband transferred his share of

the account to the United States.  Individual petitioners failed to report any of the interest income from the Standard Chartered account in 1987 and 1988.  The parties settled the amount of individual petitioners' deficiency attributable to the interest income for 1987 and 1988 in the amounts of $15,731 and $19,722, respectively.

Petitioner husband was aware of the Standard Chartered account and its balance.  Statements from the Standard Chartered bank account were addressed to "Chan Don A. & Lily Chan".  In prior years, the statements were usually mailed to Eastimpex's office.  During the years in issue, however, the statements were mailed to an address in Hong Kong.  Individual petitioners received mail regarding their personal finances at their personal address as well as at their Eastimpex office.  They depended on Eastimpex's bookkeepers to turn over mail received at Eastimpex to petitioners' accountant.  Individual petitioners did not file Treasury Form 90-22.1, Report of Foreign Bank and Financial Accounts, during the years in issue to disclose the overseas bank account, as required.

OPINION

Corporate petitioner Eastimpex has failed to produce invoices for a portion of the amount it claimed as the cost of goods sold.  Eastimpex contends that it did not receive accurate invoices of its costs in order to help its related supplier Shin conceal income from the Taiwanese Government.  Eastimpex asserts

that this scheme was devised only to avoid Taiwanese tax and not to deceive the Internal Revenue Service in any way. We do not find this explanation to be credible.

Individual petitioners contend that Shin lent the deposited amounts to its shareholders. Once Shin was repaid, it used the money to pay farmers and workers in cash. Shin does not have receipts for these payments. We do not accept petitioners' elaborate explanation of Shin's lending practices. Rather, we find that petitioner husband controlled both Shin and Eastimpex and used the alleged payments to Shin as a way to give money to his mother. Lily received substantial distributions from the accounts and held the account passbooks although she owned a very small percentage of Shin. There is no evidence that Lily repaid Shin for these alleged loans or that Shin made withdrawals for business purposes from the Coast and First Pacific accounts. These factors indicate that the subject accounts were created for the personal purposes of individual petitioners and not created for business purposes of Shin. The admittedly deceptive recordkeeping was used in part to benefit individual petitioners.

Respondent determined that the deposited amounts were not paid to Shin for the purchase of goods and thus disallowed their treatment by Eastimpex as the cost of goods sold. Respondent further determined that the deposited amounts constituted constructive dividends from Eastimpex to individual petitioners.

Cost of Goods Sold

The first issue we consider is whether Eastimpex is entitled to treat the deposited amounts as part of its cost of goods sold. The cost of goods purchased for resale in a taxpayer's business is subtracted from gross receipts to compute gross income. Sec. 1.61-3(a), Income Tax Regs. Such costs are not deductions and, therefore, are not subject to the limitations on deductions contained in section 162. Max Sobel Wholesale Liquors v. Commissioner, 630 F.2d 670, 671-672 (9th Cir. 1980), affg. 69 T.C. 477 (1977); see secs. 1.61-3(a), 1.162-1(a), 1.471-3, Income Tax Regs. The treatment of the payments on the books of the parties to the transaction, while of some evidentiary value, is not controlling. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 660 (1987) (citing Estate of Lehr v. Commissioner, 18 T.C. 373, 380 (1952)). Taxpayers bear the burden of proof with regard to the cost of goods sold. Rule 142(a). Taxpayers must keep sufficient records to substantiate the cost of goods sold. Sec. 6001; Wright v. Commissioner, T.C. Memo. 1993-27.

Eastimpex claims that the deposited amounts were the second part of a two-tier payment system for goods it purchased from Shin where the total of the two payments (the invoice price and the deposited amount) equals the total cost of the goods. Corporate petitioner therefore argues that the deposited amounts should be considered the cost of goods sold. There is no dispute regarding whether the invoice price represents the cost of goods sold. Respondent contends that the deposited amounts were not

paid to Shin for goods and argues that Eastimpex and Shin used the two-tier payment system to divert funds for the personal benefit of individual petitioners. We find that Eastimpex has failed to prove the deposited amounts were for the cost of goods sold.

Corporate petitioner has produced invoices that establish the first payments were for the purchase of goods from Shin. However, it has not produced invoices from Shin for the deposited amounts. In addition, the invoices provided by Eastimpex do not contain any indication that they cover only a partial billing for the goods. Rather, Eastimpex contends that the amount of the deposits can be recreated by comparing the invoice price with the full list price from Shin's price list and offers canceled checks for the deposited amounts. In addition, petitioner husband gave self-serving testimony that the deposited amounts were for the cost of goods sold.

Eastimpex offered an excuse for its failure to produce invoices associated with the deposited amounts which we do not find credible. First, it was explained that the Taiwanese Government would not permit a deduction for expenses without an invoice or evidence of payment. In that regard, it is contended that Shin used cash to purchase its agricultural raw materials because local farmers refused to give Shin accurate receipts for its purchases. In addition, Shin paid its seasonal workers in cash. Accordingly, Shin could not substantiate these items and,

thus, could not use them to reduce its income on its Taiwanese returns.  Shin did not give invoices to Eastimpex for the alleged total sales price so that Shin could underreport its income in order to offset its inability to claim deductions for all of its expenses.  If we accede to Eastimpex's argument, we would be in the somewhat curious and dubious position of allowing Eastimpex to reduce gross income for the alleged cost of goods sold for which it lacks invoices justified by Shin's not obtaining a similar reduction against Taiwanese taxes because it also lacked invoices.

The evidence offered by Eastimpex only proves that the deposits were made.  Eastimpex has failed to prove that it made the deposits for goods it purchased from Shin.  The mere coincidence that the deposited amounts equal the difference between the invoice price and the full list price does not prove that Eastimpex paid these amounts for goods, especially given the fact that petitioner husband controlled both Eastimpex and Shin.

Petitioner husband and his immediate family owned slightly more than 50 percent of Shin, and petitioner husband was Shin's largest shareholder with 30-percent ownership.  Petitioner husband may not have asserted his power over Shin on a daily basis.  However, petitioner husband acknowledged that he had sufficient control over Shin, based on his family's majority ownership, to change its management.  In addition, petitioner husband served as chairman of Shin's board of directors.  He also

chose his close personal friend, Edward Chiu, as Shin's general manager.

Petitioner husband argued that he could not command his mother and sisters to do as he wished. Although petitioner husband may not be close to his sisters, as he contends, there is no evidence of family discord or that his sisters participated in decision-making at Shin. Henry intended for Shin to remain a family business, and petitioner husband was the only child of Henry that was involved in Shin's operations.

Petitioner husband controlled both corporate petitioner Eastimpex and Shin and used the two-tier payment system to skim profits from Eastimpex. The majority of the deposited amounts were then dispersed to or for the benefit of petitioner husband's mother, Lily, who never repaid Shin. Petitioner husband used the two-tier payment system to reduce Eastimpex's income tax by claiming the deposited amounts as costs. At the same time, petitioner husband reduced Shin's Taiwanese income tax by not recording the deposited amounts as income on Shin's books and eliminating any possible evidence that the payments could be treated as income to Shin. As a result, Shin, with petitioner husband's help, was able to avoid reporting the deposits as income to the Taiwanese Government. We find that Eastimpex did not make the deposits as payments for the cost of goods sold. Thus, Eastimpex cannot treat the deposited amounts as part of the cost of goods sold.

Constructive Dividends

The second issue we consider is whether the deposited amounts constitute constructive dividends to individual petitioners. A dividend is a distribution of property by a corporation to its shareholders out of its earnings and profits. Sec. 316(a). Dividends are taxable as ordinary income to shareholders to the extent of the earnings and profits of the corporation. Sec. 316. A dividend need not be formally declared or even intended by the corporation. Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84; Commissioner v. Makransky, 321 F.2d 598 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Sachs v. Commissioner, 277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959). In addition, the distribution need not be made to a shareholder but only for the shareholder's personal benefit. Cirelli v. Commissioner, 82 T.C. 335, 351 (1984); Edgar v. Commissioner, 56 T.C. 717 (1971). The determination of whether a constructive dividend has occurred is a question of fact which depends on each case. Hardin v. United States, 461 F.2d 865 (5th Cir. 1972).

Disallowed corporate expenditures are not automatically treated as constructive dividends to the owner of the corporation. Rather, the nondeductible expense must also represent some economic gain or benefit to the shareholder. Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977), affg. in part, revg. and remanding in part

T.C. Memo. 1973-223.  It is well established that a transfer between related corporations can result in a constructive dividend to a common shareholder if the transfer was made primarily for the personal benefit of the common shareholder. Gulf Oil Corp. v. Commissioner, 87 T.C. 548, 565 (1986); Gilbert v. Commissioner, 74 T.C. 60 (1980); Schwartz v. Commissioner, 69 T.C. 877 (1978); Rapid Elec. Co. v. Commissioner, 61 T.C. 232, 239 (1973).

To determine whether an intercorporate transfer is a constructive dividend to the common shareholder, we apply a two-part test.  Sammons v. Commissioner, 472 F.2d 449, 451 (5th Cir. 1972), affg. in part, revg. in part and remanding T.C. Memo. 1971-145; Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1029-1030 (1987), affd. 914 F.2d 396 (3d Cir. 1990).  The first part of the test is objective:  whether the transfer caused property to leave the control of the transferor corporation and thereafter the taxpayer/shareholder was able to exercise control over the property, directly or indirectly,  through some instrumentality other than the transferor corporation.  Individual petitioners argue that petitioner husband was not a signatory on the accounts as evidence of his lack of control.  Petitioner husband also denies that he was involved in any decisions regarding the accounts, such as closing the Coast account, the amount of the deposits or the prices charged by Shin, or ending the two-tier payment system.  However, we find such facts to be insignificant

in determining whether petitioner husband controlled the accounts as the controlling shareholder of Shin. Individual petitioners allege that Edward Chiu, an 18-percent shareholder, made these decisions and actually controlled Shin as its general manager. The fact that petitioner husband permitted Edward to make day-to-day decisions does not mitigate or change petitioner husband's control of Shin. Indeed, petitioner husband had the ability to fire and replace Edward. We hold that petitioner husband exercised control over the bank accounts through his controlling interest in Shin, as described above, satisfying the first part of the Sammons test.

The second part of the test is subjective: whether the transfer was prompted by a shareholder purpose of the common owner rather than a business purpose of the transferor corporation. Sammons v. Commissioner, supra. The second test is to differentiate between normal business transactions and transactions intended to benefit a common shareholder. Id. at 451-452. If the transfer between the commonly controlled corporations related to the business operations of the transferor corporation, no constructive dividend occurred.

Courts have interpreted this prong of the Sammons test to require not only a subjective intent to primarily benefit the common shareholder but also an actual primary economic benefit to the shareholder. Stinnett's Pontiac Serv. Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Kuper

v. Commissioner, 533 F.2d 152, 160 (5th Cir. 1976), affg. in part and revg. in part 61 T.C. 624 (1974). The benefit to the shareholder must be a direct, tangible benefit. Rapid Elec. Co. v. Commissioner, supra; Ross Glove Co. v. Commissioner, 60 T.C. 569, 595 (1973).

Individual petitioners contend that the bank accounts do not constitute constructive dividends to them because they did not receive the funds from the accounts. As we held above, corporate petitioner has failed to prove that the deposits were made for a business purpose; i.e., cost of goods sold. Petitioners provided convoluted and somewhat perplexing reasons for Shin's wanting to maintain the two-tier payment system. First, as stated above, Shin wanted to understate its income to offset its inability to subtract cash expenditures for which it lacked receipts. Because Eastimpex's payment of the invoice price was cleared through Taiwan's central bank, petitioners contend that the Taiwanese Government had a record of the invoice price as income from sales. Second, Shin viewed the exchange rate used by the central bank as less favorable than the street rate for U.S. currency and wanted to receive some funds in U.S. dollars to exchange outside of the central bank system. Third, Shin maintained the accounts so that shareholders and employees with a need for U.S. dollars could have easy access to them as the Taiwanese Government imposed currency restrictions that impaired the ability to obtain U.S. dollars.

Individual petitioners presented a complicated system of recordkeeping used by Shin to avoid reporting the deposited amounts as income. They contend that Shin shareholders and employees borrowed money from the Coast and First Pacific accounts and repaid Shin in Taiwanese currency within a short period of time. Shin permitted the alleged borrowers to retain any benefit they received from a favorable street rate. Shin recorded the repayments as an inflow from a shareholder; thus, on Shin's books, it would appear as if the money was due back to a shareholder. However, Shin did not record the names of the shareholders that made the alleged advances. Once the payments were recorded on Shin's books, Shin would use the money to pay farmers and seasonal workers with cash. Shin recorded the payments to the farmers and workers as outflows to shareholders. Thus, it would appear as if the shareholders were repaid for the fictitious advances.

We do not believe that individual petitioners created this elaborate scheme to benefit Shin without any expected benefit to Eastimpex or themselves. Nor do we fully believe that Shin used the deposited amounts to pay farmers and seasonal workers or that Shin's shareholders ever repaid Shin for the money it gave them. Substantial amounts from the accounts were dispersed to or for the benefit of family members of individual petitioners who did not reimburse Shin.

Lily received a $314,912 distribution from the First Pacific account in October 1988. Shin's records do not show an inflow from a shareholder at that time that would indicate that Lily repaid this amount to Shin. Shin's chief accountant, Ken Chen, who was responsible for Shin's muddled recording system, could not identify the recorded inflows that would reflect Lily's repayment even though Ken Chen claimed it was his duty to ensure borrowers repaid the alleged loans. We find that Lily did not repay this amount to Shin.

At trial, petitioner husband claimed that he did not question the reasons for the withdrawals, nor did he care who received the funds. We find it hard to believe that a 30-percent shareholder would not care who was receiving the profits from his company. This is especially so given the fact that petitioner husband never received a dividend from Shin while other shareholders with smaller shareholdings were receiving dividends.

Lily was less than a 3-percent shareholder but was receiving substantial advances from Shin that were not repaid. Lily generally held the passbooks from the Coast and First Pacific accounts and never showed them to anyone at Shin. Lily used the money from the accounts to pay the money she owed under the 1986 Agreement. In addition, the accounts were first opened when the 1986 Agreement was entered into and closed when Lily finished making the payments due under that Agreement. A distribution to a family member of the shareholder can constitute a sufficient

personal benefit to the shareholder to render the distribution a constructive dividend to the shareholder.  See Hardin v. United States, 461 F.2d at 872; Cirelli v. Commissioner, 82 T.C. 335 (1984); Marcy v. Commissioner, T.C. Memo. 1994-534; Synder v. Commissioner, T.C. Memo. 1983-692; Proctor v. Commissioner, T.C. Memo. 1981-436; Fenn v. Commissioner, T.C. Memo. 1980-229.  We hold that individual petitioners personally benefited from the transfer to Lily, and that amount is a constructive dividend from Eastimpex to individual petitioners.

Based on the above reasoning, we also find that the $116,687 paid from the First Pacific account to Daniel Chen under the 1986 Agreement constitutes a constructive dividend to individual petitioners.  In addition, we find that the check issued from the Coast account payable to Priscilla in the amount of $86,651 is a constructive dividend to individual petitioners.  We do not find petitioner husband's uncorroborated testimony that Lily ultimately received the money from this check to be credible.  Even if Lily did receive the money, individual petitioners did not present any evidence that the money was repaid to Shin.  Nor have individual petitioners proved a business purpose for this check.  Regardless of whether Lily or Priscilla received the money, we find that individual petitioners received a personal benefit because the money was given to one of their relatives without a proven business purpose.  Thus, the check issued to

Priscilla constitutes a constructive dividend to individual petitioners.

Edward and Stanley also received money from the Coast and First Pacific accounts. Edward stated that he received the money because he had a need for U.S. funds, but he could not remember what he used the money for. Edward also contends that he repaid the money to Shin within a short period of time. Respondent suggests that Edward and Stanley may have received these checks because individual petitioners owed them money or as their take of a scheme to divert funds from Eastimpex. However, there is no evidence that the payments to Stanley and Edward provided any personal economic benefit to individual petitioners or were for a purpose of individual petitioners. Thus, we find that these amounts are not constructive dividends to individual petitioners, regardless of whether Edward and Stanley repaid the amounts to Shin.

Alternatively, individual petitioners argue that Eastimpex had a valid business reason for any payments under the 1986 Agreement because the Wan Yang Chen family threatened the stability of Shin, which was a major supplier of Eastimpex. There was no evidence that Daniel Chen would obtain control of Shin. Rather, he threatened to expose the two-tier payment system to the Taiwanese Government. Individual petitioners contend that Eastimpex did not receive any benefit from the two-tier payment system except a delay in having to pay for a small

portion of its alleged costs.  These facts do not present a valid business reason for Eastimpex to make payments under the 1986 Agreement.

Additions to Tax and Penalty

Respondent determined additions to tax under section 6653(a)(1)(A) and (B) against individual petitioners for 1987 attributable to their receipt of constructive dividends and against Eastimpex for taxable year ending March 31, 1988, attributable to its improper treatment of the deposited amounts as cost of goods sold.  Section 6653(a)(1)(A) imposes an addition to tax of 5 percent of any underpayment attributable to negligence or disregard of rules or regulations.  If that addition applies, section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the understatement of tax attributable to negligence.  Respondent also determined an addition to tax against individual petitioners under section 6653(a)(1) for 1988.

Negligence is the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  Sec. 6653(a)(3).  Petitioners bear the burden of proving that the additions to tax do not apply.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Respondent also determined additions to tax under section 6661 against individual petitioners for 1987 and 1988 and against Eastimpex for taxable year ending March 31, 1988.  Section 6661(a) provides an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of tax.  Section 6661(b)(2)(A) defines the term "understatement" as being the excess of the amount of tax required to be shown on the return for the taxable year over the amount shown on the return.  An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 in the case of corporate petitioner). Sec. 6661(b)(1)(A).  The amount of the understatement can be reduced if substantial authority existed for the taxpayer's treatment of the item in dispute.  Sec. 6661(b)(2)(B).

Respondent determined an accuracy-related penalty against individual petitioners under section 6662(a) for 1989.  Section 6662(a) imposes a penalty of 20 percent of the portion of an underpayment attributable to one or more of the items set forth in section 6662(b).  In the notice of deficiency, respondent determined that petitioners' underpayment was due to:  (1) Negligence or disregard of rules or regulations, (2) a substantial understatement of tax, or (3) a substantial overvaluation statement.  See sec. 6662(b)(1)-(3).  The section 6662 accuracy-related penalty does not apply with respect to any portion of an underpayment if reasonable cause exists for the

underpayment and the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner husband is an experienced businessman who devised a bewildering payment system between two related corporations which he controlled.  Eastimpex admitted that its purpose in using the two-tier payment system was to help Shin conceal income from the Taiwanese Government.  Eastimpex also used the payment system to increase the amount it claimed as the cost of goods sold knowing that it would be unable to substantiate the deposited amounts.  In addition, individual petitioners used the two-tier payment system to divert funds to their relatives.  We find that individual petitioners and Eastimpex acted negligently and without substantial authority with regard to the deposited amounts and are liable for the above additions to tax and penalty as determined by respondent.

In addition to the additions to tax and penalty with respect to the issues involving the deposited amounts, respondent also determined additions to tax against individual petitioners under section 6653(a)(1)(A) and (B) for 1987, under section 6653(a)(1) for 1988, and under section 6661 for 1987 and 1988 attributable to their omission of interest income from the Standard Chartered account from their tax returns.  Failure to report large amounts

of income on a return has been found to be indicative of negligence.  <u>Anders v. Commissioner</u>, 68 T.C. 474, 493 (1977).

Individual petitioners knew that they received interest income from the Standard Chartered account.  In addition, the Standard Chartered account had a substantial balance and earned a significant amount of interest.  However, petitioners did not inform their accountant about the interest income or the existence of the account.  The bank statements from the Standard Chartered account were addressed to both petitioner husband and Lily Chan.  For a time, the statements were sent to the Eastimpex office.  During the years in issue, the statements were mailed to an address in Hong Kong.  Petitioner husband gave inconsistent testimony about where Lily was living during the years in issue.

Individual petitioners maintain that they reasonably relied on the Eastimpex bookkeepers to provide tax information to their tax return preparer because they received mail regarding personal finances at Eastimpex.  However, individual petitioners admitted that they received mail regarding interest income at their personal address as well as at Eastimpex's offices.  Thus, we reject petitioners' contention that their failure to report the interest income was a reasonable oversight.  We find that individual petitioners are negligent and lack substantial authority with regard to their failure to report interest income from the Standard Chartered account and are liable for the additions to tax.

After concessions by all parties and to reflect the foregoing,

Decisions will be entered

under Rule 155.